**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 46107**

STATE OF IDAHO,                                    )
                                                   )
   Plaintiff-Respondent,                       )          **Boise, August 2020 Term**
                                                   )
v.                                                 )          **Opinion filed: December 3, 2020**
                                                   )
ROBERT JAMES FARRELL-QUIGLE,                       )          **Melanie Gagnepain, Clerk**
                                                   )
   Defendant-Appellant.                        )

Appeal from the District Court of the First Judicial District of the State of Idaho, Kootenai County. John P. Luster, Senior District Judge.

The judgment of conviction is <u>vacated</u> and the case is <u>remanded</u>.

Eric Don Fredericksen, State Appellate Public Defender, Boise, for Appellant. Andrea Reynolds argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Respondent. Mark Olson argued.

---

MOELLER, Justice

Robert Farrell-Quigle appeals his judgment of conviction for two counts of lewd conduct. He contends that the use of a shielding screen at trial during the testimonies of the alleged victims deprived him of his Fourteenth Amendment due process right to a fair trial, violated his Sixth Amendment right to confront the witnesses against him, and failed to comply with Idaho's laws on alternative methods for child witness testimony. For the reasons stated below, we vacate Farrell-Quigle's judgment of conviction and remand the case for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In June 2016, Rathdrum police arrested Robert Farrell-Quigle for two counts of lewd and lascivious conduct against two of his daughters, both minors under the age of eight at the time of the alleged crimes. This case concerns the trial testimony of both daughters, referred to as "Older Daughter" and "Younger Daughter."

1

Leading up to trial, the State filed a motion seeking permission for both daughters to testify by alternative methods to avoid "increased emotional and mental trauma" from testifying in Farrell-Quigle's presence. In the State's motion, it proposed that the children be permitted to testify "outside the presence of the defendant via a closed–circuit television ("CCTV"), or in the alternative, the defendant's presence in the courtroom should be screened from both children." In support of this motion, the State presented evidence that the daughters would endure "serious emotional trauma" were they to testify in Farrell-Quigle's presence. A psychiatrist submitted an affidavit explaining that Younger Daughter would suffer serious trauma that would impair her ability to testify if she had to do so in the presence of her father. At the hearing on the motion for testimony by alternative means, Older Daughter's supervising social worker also explained that testifying in Farrell-Quigle's presence "would most likely be a triggering event," meaning it would be a "trigger" for emotional and physiological responses that could have a lasting impact "as re-traumatizing as the original event."

At the hearing on the motion, the prosecutor suggested several potential plans, including witness entry through an alternative door, rearranged seating, or the placement of a barrier between Farrell-Quigle and his daughters on the witness stand. Farrell-Quigle objected to allowing the testimony of either daughter by alternative means, arguing that the State (1) had yet to lay out a specific plan for the daughters to testify, and (2) had failed to establish by clear and convincing evidence that the daughters would suffer serious emotional trauma by testifying in Farrell-Quigle's presence. The district court reserved ruling on the motion, explaining its concerns with safeguarding Farrell-Quigle's due process rights and its desire to adopt a concrete plan, preferably by using CCTV:

> I would certainly be concerned if we had a jury walk in and had some kind of a setup that made it look like the child -- the innocent, truthful child is being protected from the evil, guilty defendant, that that's -- and that's an oversimplification of the problem, but that is a concern and I think [defense counsel] was attempting to address it. We need to figure out exactly how we can do this. And so I'm going reserve ruling on this. . . . I don't know if we can explore the [CCTV] testimony method in some fashion, but certainly the Court is open to any number of possibilities in that regard. I'm sure that you might even communicate further with the court or the trial court administrator in terms of the district court being able to provide some kind of funding or solicit the service from a reporting agency something to set this up. I know we don't have anything available directly with the court system itself, but that doesn't mean that we can't retain the services from one

of the local reporting agencies to set some kind of a [CCTV] arrangement up that would then be palatable for the Court.

After examining the assigned courtroom, the State proposed a plan for the daughters to enter the courtroom through a side door in the northwest corner of the courtroom. A projector screen would be set up in front of the defense table, blocking those on the witness stand from viewing the defendant, and the defendant from viewing the witness. There was to be no mention of the screen's presence or attention drawn to it. The district court did not hold another hearing on the motion; instead, further arguments and concerns were reserved until the trial commenced.

On the first day of trial—outside the presence of the jury—the district court informed the parties it had contacted the federal courthouse regarding use of its CCTV as an alternative method of testimony for the daughters. However, no arrangement was made to utilize a federal courtroom at that time. At the conclusion of the first day of trial, the district court informed the jury that the following day could have "a little confusion" regarding courtrooms and the presentation of testimonies.

The next morning, the district court examined the setup for the daughters' testimony arranged by the State in a courtroom in a different courthouse. The State had placed a 48 by 40 inch piece of blank, white cardboard on an aluminum easel to act as a screen between the defendant and the witness stand. The screen was perpendicular to the wall and placed in such a manner that it blocked only a portion of the defense table, thereby keeping Farrell-Quigle in full view of the judge, jury, and prosecution, while shielding witnesses from viewing him as they entered the room and sat on the witness stand. The district court described the screen and easel as "simply some courtroom equipment, basically, an aluminum tripod that has a large board that might be used to demonstrate an exhibit in front of the jury, and it seems basically to be shoved out of the way to one corner up against the wall." Defense counsel, the jury, and judge all still had a view of the witness stand and all other areas of the courtroom. A diagram of the courtroom arrangement and a photo depicting it are shown below.



*Augmented Record, page 8.*

Farrell-Quigle objected to the use of the screen, arguing it created a prejudicial effect by treating the defendant differently from the rest of the court participants. In addition, Farrell-Quigle argued that the preferred means of alternative testimony would be through CCTV, which had been expressly approved by the Idaho Supreme Court in *State v. Baeza*, 161 Idaho 38, 383 P.3d 1208 (2016).

The State countered that scheduling conflicts prevented use of the federal courtroom—the CCTV was only available in the afternoon while the daughters were scheduled to testify in the morning. However, there were no findings as to why the daughters could not have testified in the afternoon. In addition, the State argued that the screen was "not at all obvious" in blocking the defendant from the witnesses, and that problems could arise by trying to shout questions or show the daughters exhibits through CCTV. Notably, however, no exhibits were shown to the daughters during their testimony. After hearing arguments from both sides, the district court approved the use of the shielding screen in the courtroom, but still expressed an overall preference for using

4

CCTV. To explain the courtroom change, the bailiff informed the jury there were scheduling conflicts at the courthouse.

When the trial resumed, the screen was placed directly between Farrell-Quigle and the witness stand for the duration of both daughters' testimony. During Younger Daughter's testimony, her treating psychiatrist, Dr. Carlisle, sat near the witness stand for emotional support, using a chair in front of the clerk's stand. Both daughters were eleven years old at the time of the trial.

During a recess after the daughters finished testifying, the State turned the easel sideways 90 degrees so that the shielding screen was parallel with the wall. Although the easel remained in the same general location, the shielding screen no longer blocked anyone on the witness stand from viewing Farrell-Quigle. Nothing was ever said or done in front of the jury to deliberately bring attention to the screen. That afternoon, a subsequent witness entered through the northwest door, like both daughters, to maintain consistency of the procedure used before the jury. In addition, the trial concluded on the third day in this same courtroom, as the district court explained, "[s]o it doesn't look like we just came here for a limited number of witnesses."

At the conclusion of the trial, the jury found Farrell-Quigle guilty on both counts of lewd conduct. The district court sentenced him to serve twenty-five year concurrent sentences on both counts with twelve years fixed. Farrell-Quigle timely appealed.

## II. STANDARD OF REVIEW

This case primarily concerns rights protected under the Sixth and Fourteenth Amendments to the U.S. Constitution, as well as the procedural safeguards contained in Idaho Code section 9-1806. This Court freely reviews constitutional issues, which are questions of law. *State v. Baeza*, 161 Idaho 38, 40, 383 P.3d 1208, 1210 (2016). Likewise, as with questions of law, the Court exercises free review over questions of statutory interpretation. *State v. Leary*, 160 Idaho 349, 352, 372 P.3d 404, 407 (2016).

## III. ANALYSIS

**A. The use of a shielding screen deprived Farrell-Quigle of his Fourteenth Amendment due process right to a fair trial.**

Farrell-Quigle argues the use of the shielding screen deprived him of his Fourteenth Amendment right to a fair trial because it implied his guilt and a need to protect the child witnesses from him. In addition, Farrell-Quigle contends that had CCTV been utilized, it would have been

5

less prejudicial while more effectively protecting the physical and psychological wellbeing of both children.

"The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment." *Estelle v. Williams*, 425 U.S. 501, 503 (1976). Although the presumption of innocence is not among the rights of the accused enumerated in the text of the U.S. Constitution, it is a core component of a fair trial in the criminal justice system. *Id. See also Coffin v. United States*, 156 U.S. 432, 453 (1895) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."). When it comes to trial practices that may adversely affect the rights of the accused at trial, it has been observed that although "[t]he actual impact of a particular practice on the judgment of jurors cannot always be fully determined," there is "no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny." 425 U.S. at 504. "Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience." *Id.* Where this Court "finds an 'inherently prejudicial practice,' the Court considers whether it is 'justified by an essential state interest specific to each trial.' " *State v. Baeza*, 161 Idaho 38, 41, 383 P.3d 1208, 1211 (2016) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986)).

Therefore, to evaluate Farrell-Quigle's Fourteenth Amendment claim, this Court must: (1) "closely scrutinize" whether the screen used by the district court was inherently prejudicial; and, if so, (2) whether the screen nonetheless served an essential state interest, which justified its use.

### 1. *The shielding screen was inherently prejudicial.*

We held in *State v. Baeza* that "inherent prejudice is found where the practice in question may have a direct impact on the jury's perception of the defendant." *Id.* Here we must assess whether the presence of the screen used to shield Farrell-Quigle's daughters from seeing him during their testimony may have directly influenced the way jurors viewed Farrell-Quigle.

Our analysis must account for what jurors were most likely to infer from the courtroom setup, including whether those inferences were so wide ranging as to dampen any prejudicial effect. For example, in *Holbrook v. Flynn,* the U.S. Supreme Court held that the presence of four uniformed state troopers in the courtroom was not inherently prejudicial because of "the wider range of inferences that a juror might reasonably draw from the officers' presence." 475 U.S. at 569. The U.S. Supreme Court explained:

> To be sure, it is possible that the sight of a security force within the courtroom might under certain conditions create the impression in the minds of the jury that the defendant is dangerous or untrustworthy. However, reason, principle, and common human experience counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial. In view of the variety of ways in which such guards can be deployed, we believe that a case-by-case approach is more appropriate.

*Id.* (internal citations and quotation marks omitted).

This case-by-case approach has resulted in our sister jurisdictions viewing the use of shielding screens in multiple ways under the Fourteenth Amendment. For example, the Michigan Court of Appeals concluded that a shielding screen, like the uniformed troopers in *Flynn*, could conjure a wide array of inferences. *People v. Rose,* 808 N.W.2d 301, 315–17 (Mich. App. 2010). *Rose* extrapolated from Justice Blackmun's dissent in *Coy v. Iowa*, 487 U.S. 1012 (1988), a U.S. Supreme Court case concerning a shielding screen that did not reach the Fourteenth Amendment in the majority opinion. Justice Blackmun wrote that a screen is not inherently prejudicial because, unlike shackles or prison garb, a screen is not a symbol of *conviction* for a crime. *Id.* at 1034-35 (Blackmun, J., dissenting)). The Michigan Court of Appeals agreed that a shielding screen, unlike such obvious marks of guilt, could be interpreted a variety of ways by jurors, especially where child witnesses are involved, because juries expect child witnesses to be fearful of the person against whom they are testifying. *Rose*, 808 N.W.2d at 316–17. They went on to suggest that a shielding screen might be viewed as a tool to calm general anxiety rather than to protect a child from a particular, guilty defendant. *Id.*

Contrast this with the Nebraska Supreme Court's decision in *State v. Parker*, in which that court found a shielding screen placed between a testifying child witness and a defendant was inherently prejudicial because the defendant's guilt hinged on the truthfulness of the child's testimony, and the screen reasonably appeared to be the court's implicit endorsement of that witness's truthfulness. *State v. Parker*, 757 N.W.2d 7, 18 (Neb. 2008), *opinion modified on denial of reh'g*, 767 N.W.2d 68 (2009). The Nebraska Supreme Court found that, under circumstances where the jury was being asked to assess the veracity of the child witness's story, there could be no other innocuous explanation for the screen than that the court had sided with, and was protecting, the child. *Id.*

This Court has previously considered the problem of inherent prejudice in alternative methods of testimony for child witnesses. Thus, our decision here must be informed by our

7

previous finding in *State v. Baeza* that "child-friendly" practices, which center on comforting the child, rather than protecting the child from the defendant, are not inherently prejudicial. 161 Idaho at 42, 383 P.3d at 1212. There, we found the use of CCTV was not inherently prejudicial because its "child-friendly" focus was on the status of the child witness as a *child*—she was also given crayons, a coloring book, and a child-friendly oath—rather than as a *victim* who needed protection from the menacing presence of a "guilty" defendant. 161 Idaho at 42-43, 383 P.3d at 1212-13. Although the trial court in *Baeza* also instructed that the camera be set up in such a way the child would not have to see the defendant, the jury had no way to know that. As far as the jury could see, the defendant was treated no differently from anyone else in the courtroom in relation to the child. *Id*.

It is noteworthy that our decision in *Baeza* also came with a warning about setting up the courtroom in a way that singled out a defendant. *Id.* at n.2. The defendant had suggested simply moving the witness chair so the child witness would not have to see him. *Id.* However, we found that suggestion problematic, noting "that such a procedure would have a far greater potential for damage to the defendant's presumption of innocence, as it might suggest to the jury that the court had determined that the child witness required some form of protection from viewing the defendant." *Id.*

The district court in Farrell-Quigle's case appeared to be well aware of the concerns raised in that warning, initially saying about the State's proposal to use a screen, "I would certainly be concerned if we had a jury walk in and had some kind of a setup that made it look like the child— the innocent, truthful child is being protected from the evil, guilty defendant . . . ." At that time, the district court stated a clear preference for using CCTV as the alternative method of testimony and expressed a clear discomfort with the use of a screen. In fact, the district court went so far as to look into the use of CCTV on behalf of the State, even though the State bore that burden. Only when a scheduling conflict made the use of CCTV inconvenient did the district court acquiesce to the State's plan to use a screen, which the State had already arranged for in a nearby courthouse.

In agreeing to the use of the screen, the district court described the innocuousness of the setup, saying it appeared to be "simply some courtroom equipment, basically, an aluminum tripod that has a large board that might be used to demonstrate an exhibit in front of the jury, and it seems basically to be shoved out of the way to one corner up against the wall." The district court noted its earlier concern that the jury would view the setup as "shielding the child from the defendant

8

and leading to some kind of inference of guilt." Ultimately, however, the district court concluded that the screen satisfied due process concerns, ruling from the bench that, even if "the astute juror" noticed the screen was shielding the defendant from the child witness's view, it would not create an "overwhelming unfair imposition of prejudice." The court averred that, in the context of a sexual molestation case involving a father, the "common sense juror" would likely view the shield as easing an "awkward situation."

We give deference to the trial court's finding of facts, including its assessment that the screen in the courtroom was unobtrusive. However, the district court's determination that the use of the screen would not create an "overwhelming unfair imposition of prejudice" creates a higher standard for finding prejudice than the Fourteenth Amendment test articulated by the U.S. Supreme Court in *Estelle*, and adopted by this Court in *Baeza*. For example, we held in *Baeza* that inherent prejudice exists where a practice "may have a direct impact on the jury's perception of a defendant." 161 Idaho at 41, 383 P.3d at 1211. Thus, the defense does not need to show the prejudice would be "overwhelming;" rather, it need only show that the use of the shielding screen "may have" directly affected how the jury viewed the defendant. Therefore, we consider de novo the Fourteenth Amendment analysis of whether the shielding screen used in Farrell-Quigle's trial may have affected jurors' perceptions of him.

Here, the jurors were told that, due to a scheduling conflict, the remainder of the trial would be held in a different courtroom in a neighboring courthouse. In that new courtroom, a screen—a large, blank piece of white cardboard placed on an aluminum easel—had been placed perpendicular to a wall between the witness stand and the defendant's seat, so as to appear to jurors as something casually set aside from another trial. The screen prevented the defendant and the two child witnesses testifying against him from seeing one another. The record indicates that from the seats directly across from it in the jury box, the screen may have been placed at such an angle as to render it somewhat inconspicuous. However, a fair review of the diagrams and photographs of the courtroom layout in the record, including those depicted above, reinforces the view that the presence of the screen—and its true purpose and effect—would have been obvious to the jurors, especially those seated at either end of the jury box. In hopes of not calling attention to the screen, it was left in place for the remaining two days of the trial. However, the screen was turned parallel with the wall after the daughters testified so as to avoid blocking the defendant and subsequent witnesses from seeing one another.

A key moment in any criminal jury trial is when accuser and accused face each other in court, and to be sure, jurors watch and assess that encounter with heightened interest. Here, the jurors knew the defendant's daughters had entered the courtroom to testify about the acts of lewd conduct they claimed he had committed against them. Again, it goes against "reason, principle, and common human experience" to believe that at least some jurors did not lean forward to study and scrutinize the defendant and his daughters' respective demeanor and how they reacted to seeing each other at this moment of the trial. At that point, it would have become obvious— assuming it was not obvious already—that the screen was serving as a shield that prevented the witness and defendant from observing one another. If the purpose of the screen were not clear enough during the daughters' testimony, then the point would have been further emphasized when jurors returned from a recess after the daughters had finished testifying only to find the shielding screen had been turned and moved flush against the wall so the defendant and the remaining witnesses could regard one another. Again, "reason, principle, and common human experience" suggest that at least some members of the jury would have surely discerned what was going on, no matter how adeptly the plan was executed.

Although it appears likely that all of the jurors would have observed the screen, no one can say with certainty what inferences the jurors actually drew when they saw it. Nevertheless, this Court must acknowledge how reasonable—how human—it would have been for any or all of the jurors to comprehend that the screen was blocking the view of the defendant from the witnesses and that, given the nature of the conflict between those parties, it had been placed there on purpose by the district court to protect the young witnesses from the trauma of seeing the defendant. Thus, despite the district court's well-intentioned efforts to avoid treating the defendant differently, different treatment is very likely what jurors perceived, and so the setup becomes exactly that which we cautioned against in *Baeza*.

We acknowledge that a possibility remains that jurors could have made a wider array of inferences about the screen, including that it was a "child friendly" prop meant generally to make testifying more comfortable for the children. As noted by the Michigan Court of Appeals in *Rose*, jurors might expect any child appearing in court to be nervous, especially while in the presence of the person they are accusing of a crime. However, this Court's warning in *Baeza* contradicts that viewpoint, expressing a need to be more critical of any circumstances that single out a defendant for disparate treatment during a jury trial. Even if jurors viewed the screen as a comfort measure,

10

it was still a measure that pointed at the defendant alone as the source of the child's discomfort and fear. Such a procedure fails the test in *Baeza* because it would unavoidably lead to inferences by the jury that were inherently prejudicial to the defendant.

The screen's prejudicial effect is also self-evident from the discussion the district court had with counsel about giving a jury instruction to explain the presence of the screen. The district court cautioned the defense: "I don't need to do anything that would draw undo attention to the situation that may otherwise be avoided if we ignore it." Ordinarily, Farrell-Quigle would have been free to request an instruction to jurors admonishing them to give no weight to any child-friendly practices used during the trial, such as the psychiatrist who sat next to Younger Daughter or the presence of a comfort animal or toy. However, the district court could not do so here because it would contradict the supposed happenstance of the screen's appearance in the courtroom—tipping off jurors that the scheduling conflict and the courtroom switch, coupled with the failure to acknowledge the screen that blocked the defendant from view, were due to the district court's own machinations. This points to how precariously the protection of Farrell-Quigle's rights rested on the hope jurors would simply not pay close attention to what they were seeing—literally right in front of them. We cannot support a practice that is based on the mere hope that trial jurors are neither alert nor perceptive. In fact, history teaches us that the opposite is true.

We acknowledge the dissent's robust defense of judicial discretion and deference to the district court. The dissent has helpfully included extensive excerpts from the record to illustrate the findings to which it believes we owe deference. However, we respectfully disagree that the district court made any definitive findings to which deference is owed. For example, the district court's oral ruling made no findings about whether, from the perspective of the jurors' seats, a juror could discern that the screen was purposely placed to shield the defendant from the victims' view. In fact, the district court did not use the word "find" once in its oral ruling quoted by the dissent. Rather, the court repeatedly spoke in the language of conjecture: "it appears to me," "it looks," "it seems," "the [c]ourt does not feel," "I don't like," "I think," and "I don't think." It is not overly fastidious to conclude that such speculative terminology is not the equivalent of a finding of fact. Simply put, appearances, feelings, preferences, and thoughts do not constitute a finding of fact. Rather, "[a] finding of fact is a *determination of a fact* supported by the evidence in the record." *Crown Point Dev., Inc. v. City of Sun Valley*, 144 Idaho 72, 77, 156 P.3d 573, 578 (2007) (emphasis added) (*citing* Black's Law Dictionary 284 (2d Pocket ed. 2001)).

11

Although "[w]e give due deference to any implicit findings of the trial court supported by substantial evidence," the photographic evidence in the record does not support the district court's observations about the impact of the screen on jurors. *State v. Yager*, 139 Idaho 680, 684, 85 P.3d 656, 660 (2004). The photographs and diagrams of the courtroom, including those set forth above, show that the shielding screen was visible to any juror, especially those seated on the far edges of the jury box. The district judge acknowledged this: "I agree with [defense counsel] that the astute juror might note that things are set up in such a fashion that may screen off the defendant's view of – these children testifying against him." Even if we treat the district court's statement that the impact of the shielding screen was "miniscule" as a finding of fact, that finding would still be subject to a clearly erroneous standard that it could not survive. *Bolger v. Lance*, 137 Idaho 792, 794, 53 P.3d 1211, 1213 (2002) ("A trial court's findings of fact will not be set aside unless clearly erroneous, which is to say that findings that are based upon substantial and competent, although conflicting, evidence will not be disturbed on appeal."). After carefully reviewing the photographic evidence in the record, we hold that the district court's observation that the shielding screen was "relatively a miniscule interference" was clearly erroneous. From the vantage of at least some jurors, the shielding screen's purpose in obstructing the victims' view of the defendant would have been obvious and prejudicial.

We recognize that the district court was faced with the unenviable task of protecting two young and vulnerable witnesses, while simultaneously balancing the defendant's constitutional rights. We also note that the district court earnestly wrestled with this difficult problem—one that was certainly not of its own making. Nevertheless, the Fourteenth Amendment requires us to exercise "close judicial scrutiny" in reviewing the procedures utilized in this case. *Estelle*, 425 U.S. at 503. After applying close scrutiny, we conclude that the plan approved by the district court did not meet the standard for protections under the Fourteenth Amendment. Instead, it more than likely signaled to the jury that something strange was afoot. The courtroom configuration authorized here was not a routine courtroom arrangement. The placement of the screen would have prompted any attentive juror to wonder why the witnesses' view of the defendant had been blocked without any acknowledgement. The potential impact is all the more troubling given that the State's case against Farrell-Quigle rested heavily on the jury's determination that the daughters were telling the truth. In sum, we conclude that the use of the shielding screen may have been reasonably

perceived by jurors as an attempt to protect the children from a guilty or dangerous defendant. Accordingly, we hold that the use of a shielding screen in this case was inherently prejudicial.

## 2. *The shielding screen did not serve an essential state interest.*

Even though we have concluded that the shielding screen used here was inherently prejudicial, the use of the screen may nonetheless be permissable under the Fourteenth Amendment if the inherent prejudice is outweighed by an essential state interest. Neither party disputes that the well-being of children is an essential state interest. However, Farrell-Quigle argues this Court must also consider whether a better, less prejudicial method of testimony was reasonably available. We agree that permitting an alternative method of testimony that creates inherent prejudice cannot be justified under the Fourteenth Amendment due process clause where the record demonstrates that a less prejudicial method was reasonably available.

Showing a likelihood of trauma to a testifying child is generally sufficient to establish the necessity of an alternative method of testimony. The U.S. Supreme Court held in *Maryland v. Craig* that "if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant." 497 U.S. 836, 855 (1990). Likewise, Idaho's Uniform Child Witness Testimony by Alternative Methods Act, Idaho Code sections 9-1801-1808 ("the Act"), emphasizes a similar state public policy interest in protecting children who testify, and permits alternative means of testimony where "the child would suffer serious emotional trauma that would substantially impair the child's ability to communicate with the finder of fact if required to be confronted face-to-face by the defendant." I.C. § 9-1805(1)(b). For purposes of the Act, a "'Child witness' means an individual under the age of thirteen (13) years who has been or will be called to testify in a proceeding." Idaho Code § 9-1802. Neither party disputes the necessity of using an alternative means for Younger Daughter's testimony.[1] Thus, for the purposes of this analysis, the necessity for alternative means of testimony was proved.

In addition to establishing the likelihood of trauma that would inhibit a minor victim's ability to testify, the Act also requires courts to use a narrowly tailored approach in considering

---

[1] We need not reach whether necessity was adequately proved regarding Older Daughter's testimony because the use of the screen during Younger Daughter's testimony is sufficient to vacate Farrell-Quigle's conviction.

13

the particular alternative method of testimony chosen over others. Idaho Code section 9-1806 lists a variety of factors to be considered:

(1) Alternative methods reasonably available;
(2) Available means for protecting the interests of or reducing emotional trauma to the child without resort to an alternative method;
(3) The nature of the case;
(4) The relative rights of the parties;
(5) The importance of the proposed testimony of the child;
(6) The nature and degree of emotional trauma that the child may suffer if an alternative method is not used; and
(7) Any other relevant factor.

Similarly, Idaho Code section 9-1807(3) requires that the alternative method "be no more restrictive of the rights of the parties than is necessary under the circumstances to serve the purposes of the order." These statutory requirements are a recognition of the constitutional duty of courts to consider the rights of all parties involved and how the alternative method chosen stands in comparison to other methods that were reasonably available.

This balance is reflected in our decision in *Baeza*, where we determined the use of CCTV was not inherently prejudicial, and further reasoned "the remote possibility" of lurking prejudice caused by the use of CCTV "was outweighed by an essential state interest." *Id.* at 43, 383 P.3d at 1213. As noted above, we found CCTV to be a "child friendly" method that did not call attention to the defendant. Therefore, as long as the State showed the necessity of using an alternative method of testimony for a child, we found the use of CCTV to be permissible under the Fourteenth Amendment.

On the other hand, we warned in *Baeza* that an arrangement in the courtroom which protected a witness from seeing the defendant, but treated the defendant differently than other witnesses, "would have a far greater potential for damage to the defendant's presumption of innocence, as it might suggest to the jury that the court had determined that the child witness required some form of protection from viewing the defendant." *Id.* at n.2. The words "far greater potential" suggest a known hierarchy—one which places CCTV in a superior position over methods like the shielding screen used here, which single out a defendant. Thus, constitutional considerations reflected in section 9-1807, as well as in our warning in *Baeza*, require us to consider whether the use of the screen and the accompanying deprivation of rights were narrowly tailored to the needs of this trial.

14

Here, the district court only addressed the different levels of protection against emotional trauma—i.e., those factors that had established the necessity of an alternative method in the first place—afforded by the use of a shielding screen versus CCTV. The district court stated that trauma "probably could be eliminated better through the closed-circuit TV . . . ." However, the court also noted that having the children in the courtroom would make it easier to "get a better feel for [their] responses . . . ." Thus, the district court erred by failing to focus on whether the use of the screen was narrowly tailored to *both* the needs of the witnesses and the due process rights of the defendant.

Importantly, the State failed to offer any reasons why the use of the shielding screen would be more narrowly tailored in this case than CCTV. Instead, the State asserted three reasons for its preference for using the screen over CCTV: (1) inconvenient timing—the CCTV was only available in the afternoon, and the daughters were scheduled to testify in the morning; (2) a concern that questions would have to be "shouted" to the witnesses over CCTV; and (3) a concern that it would be difficult to show the witnesses exhibits over CCTV and have them describe where they had been touched. In regards to the State's second and third concerns, the State offered no explanation as to why it would have been necessary to shout to communicate, nor what the exact difficulty would be with exhibits. In the end, the State did not use any exhibits during the daughters' testimony, nor did the State offer an argument as to why these concerns should outweigh the risk to the defendant's rights that might occur with the use of the screen.

The State's first concern, and the decisive factor in the district court's decision to allow the use of the shielding screen, seems to have been timing, and that is what is most troubling. The district court acquiesced to the screen primarily because of a failure in planning on the part of the State. The record suggests that no one attempted to make arrangements for CCTV until the day before the scheduled testimony—and that attempt was initiated by the district court. By then, the CCTV-capable courtroom was only available in the afternoon of the following day, and the daughters were apparently scheduled to testify in the morning. In the meantime, the State had gone ahead and set up in a different courtroom in another courthouse with the shielding screen so defense counsel and the district court could look it over. It is unclear from the record whether at this time the daughters were at the courthouse, still at home, or on their way. Certainly, in the midst of a trial, there existed a risk that rescheduling the daughters' testimony might cause them added stress, as well as be an inconvenience to the jury. Nevertheless, the State in no way demonstrated, nor did the district court find, that keeping the testimony on schedule was a component of its

15

interest in protecting the well-being of the children. Even more critically, there was no finding that these timing pressures outweighed the potential deprivation of Farrell-Quigle's due process rights.

It is undisputed that the use of an alternative method of testimony was necessary for Younger Daughter. However, the district court's decision to use the shielding screen instead of CCTV, which this Court had previously found does not result in inherent prejudice where necessity has been shown, was at its core a decision borne out of convenience. Convenience alone cannot outweigh a defendant's constitutional rights. Given the technological advancements in video conferencing available in 2017, when this case went to trial, it is difficult to understand why arrangements were not made for the remote testimony of the child witnesses, via CCTV or an alternate form of video conferencing technology, well before trial. Here, the CCTV procedure was reasonably available, even if the delay in scheduling a courtroom made it inconvenient. Therefore, we conclude that the State did not meet its burden to demonstrate a compelling state interest outweighed the inherent prejudice caused by the use of the shielding screen, especially where a less prejudicial alternative was available.

### 3. *This case illustrates the need for a bright-line rule.*

At the time of Farrell-Quigle's trial in 2017, this Court had already issued our decision in *Baeza* and expressly approved the use of CCTV as an alternative method of testifying that, so long as the State proved there was a compelling state interest, would not violate a defendant's rights under the Fourteenth Amendment. However, we did not entirely foreclose the possibility that other practices might also satisfy the Fourteenth Amendment test. A number of factors demonstrated by this case, coupled with the significant advances in teleconferencing technology, now persuade us that a bright-line rule is preferable. Such a rule will promote consistency among our state trial courts and remove any uncertainty from judges and attorneys as to which method is constitutionally required.

Moving forward, this Court adopts a new rule that upon a showing of a compelling state interest, the only permissible alternative method of testimony for child-witnesses, as defined by Idaho Code section 9-1802, will be one in which the child-witness testifies from a separate location and appears live, on screen in the courtroom, via two-way CCTV or through other reliable video conferencing means. As in *Baeza*, when such a procedure is utilized, the camera may be set so that the defendant is not seen by the child witness, so long as this would not be evident to the jury. Prior to the child's testimony, and at the close of evidence, the jurors should be instructed that they

16

should "not give any different weight to [the child witness's] testimony because of the *child-friendly* procedures used during her testimony." 161 Idaho at 40, 383 P.3d at 1210 (emphasis added).

We recognized in *Baeza* that "child-friendly" practices in which the focus is solely on the witness as a child, as opposed to the accused as a defendant, best protect a defendant's right to a fair trial. We have identified no other method of alternative testimony that protects those rights as effectively as live witness testimony from a separate location that is viewable on screen in court, as with CCTV. Indeed, unlike a shielding screen, which in the eyes of the jury would appear to serve no other purpose than to protect a child witness from the defendant, CCTV or its equivalent would reasonably appear to protect the child generally from the trauma of testifying in a full courtroom.

This case highlights how the absence of a bright-line rule creates uncertainty for our trial courts and may harm child witnesses who, in the event a new trial is warranted, will be forced to endure the difficulties of testifying a second time. A bright-line rule will create such certainty while protecting child witnesses. This rule further supports an essential state interest, as reflected in the Uniform Child Witness Testimony by Alternative Methods Act, which compels courts to consider multiple factors in narrowly tailoring the alternative method of testimony to the needs and rights of the parties. Idaho Code § 9-1806. Today we conclude that properly conducted, live, on-screen testimony via CCTV, Zoom, or other secure and reliable video conferencing technology, best protects against inherent prejudice—while simultaneously promoting an essential state interest—because it does not treat defendants differently from any other person in the courtroom in regard to the child-witness.

To be clear, live, in-person witness testimony before the jury, which provides the defendant an opportunity for direct confrontation with the State's witnesses, should continue to be the norm in criminal trials. Thus, this ruling only applies to the very narrow category of cases involving vulnerable child witnesses under the age of 13, and only when the court finds by clear and convincing evidence that the conditions set forth in Idaho Code section 9-1805(1) have been met.

If technological limitations once limited the ability of courts to opt for live, on-screen testimony, that is no longer the case. Secure and reliable platforms for video conferencing are now widely available. Indeed, the COVID-19 pandemic has necessitated that a variety of court proceedings take place via Zoom. This experience has sufficiently demonstrated to us that effective

17

presentation of live testimony from a separate location is now well within the technological reach of any court in Idaho. Given the widespread availability of such technology, this Court can no longer justify supporting alternative methods of testimony that provide lesser protection of a defendant's right to a fair trial.

**B. This decision does not reach Farrell-Quigle's Sixth Amendment or statutory arguments.**

Because we have decided this case on Fourteenth Amendment grounds and remanded it for a new trial, only a brief discussion is merited as to whether the use of the shielding screen in this trial also violated the Confrontation Clause of the Sixth Amendment or Idaho state law. However, it is instructive to note that although often linked together, the constitutional analyses of the Fourteenth Amendment and Sixth Amendment issues are different in important ways.

As previously noted, the Fourteenth Amendment due process analysis requires us to consider whether the alternate method of testifying is (1) "inherently prejudicial" and (2) "justified by an essential state interest specific to each trial." *Holbrook*, 475 U.S. at 568–69. On the other hand, the Sixth Amendment's Confrontation Clause requires us to determine whether (1) the denial of a face-to-face confrontation at trial "is necessary to further an important public policy" and (2) "the reliability of the testimony is otherwise assured." *Craig*, 497 U.S. at 850. We observed in *Baeza*, that "the Confrontation Clause 'reflects a preference for face-to-face confrontation' that must 'occasionally give way to considerations of public policy and the necessities of the case.' " 161 Idaho at 43, 383 P.3d at 1213, quoting *Craig*, 497 U.S. at 849.

In Idaho, the Uniform Child Witness Testimony by Alternative Methods Act defines both the "essential state interests" and the "important public policy's considerations" to be followed before implementing an alternative means of testimony for a child witness. Idaho Code §§ 9-1805 and -1806. Thus, the major distinction between the two standards is the 14th Amendment's requirement of finding "inherent prejudice," while the Sixth amendment focuses on the "reliability of the testimony." Where we have already found that the procedure utilized here was inherently prejudicial because it created an appearance of guilt, there is no need for us to determine whether the testimony given while a shielding screen was present was reliable. Additionally, we have already noted our approval of CCTV in the face of a similar challenge in *Baeza*.

**C. The State failed to prove harmless error.**

The State argues in the alternative that any constitutional error was harmless because the screening method employed at trial did not contribute to the guilty verdict and instead provided a better means for fact-finding and confrontation than the CCTV procedure would have. In addition, the State argues that "an appropriate harmless error analysis must consider whether the difference, from the jury's perspective, between the victim testimony being provided through the screening process utilized at the trial, and the victim testimony being provided through a closed-circuit television system, would have resulted in different verdicts." However, the State misconstrues the harmless error test.

"[A]s a general rule, most constitutional violations will be subject to harmless error analysis." *State v. Perry*, 150 Idaho 209, 223, 245 P.3d 961, 975 (2010). The harmless error test provides that "once the defendant shows that a constitutional violation occurred, the State has the burden of demonstrating beyond a reasonable doubt that the violation did not contribute to the jury's verdict." *State v. Adamcik*, 152 Idaho 445, 472, 272 P.3d 417, 444 (2012). Contrary to the State's proposed analysis, "the inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). *See also Perry*, 150 Idaho at 223, 245 P.3d at 975.

Here, the State's focus on the alleged benefits of the screening procedure over CCTV disregards our previous decision in *Baeza* and does nothing to alleviate the possibility that the use of the shielding screen contributed to a guilty verdict for the defendant. The State did not prove beyond a reasonable doubt that the guilty verdict was unattributable to the constitutional errors associated with the use of the screen. Thus, this Court concludes that the State failed to prove harmless error.

## IV. CONCLUSION

We conclude that the use of a shielding screen as an alternative method of testimony for child witnesses violated Farrell-Quigle's right to a fair trial under the Fourteenth Amendment. Therefore, we vacate the judgment of the district court and remand for further proceedings consistent with this opinion. Moving forward, this Court hereby adopts a new rule that upon a showing of a compelling state interest, as set forth in Idaho Code section 9-1805, the only permissible alternative method of testimony for child witnesses will be one in which the witness

19

testifies from a separate location and appears live, on screen in the courtroom via CCTV or other reliable video conferencing technology.

Chief Justice BURDICK, Justices BRODY and STEGNER **CONCUR.**

BEVAN, Justice, dissenting:

The majority opinion today orders a retrial for Robert James Farrell-Quigle because his right to due process was violated by a district court's decision to allow a "screen" to be placed strategically in a courtroom to protect his two minor daughters from seeing Farrell-Quigle's face while they testified. I respectfully dissent from this view for two primary reasons: first, a learned trial judge with significant real world trial experience found the screen to be an appropriate means to satisfy a significant state interest – that is, protecting the mental and emotional health of the minor victims who were testifying against their father. Second, I do not believe that this Court's adoption of CCTV or video conferencing as a "bright-line rule" solves the problems the majority seeks to remedy.

### A.  The procedure followed here did not violate Farrell-Quigle's due process rights.

As an initial point, I would differentiate the standard of review stated by the majority. While I agree that we freely review whether constitutional requirements have been met, we must also defer to a district court's factual findings supported by substantial evidence. "When a violation of a constitutional right is asserted, this Court will accept the trial court's factual findings unless such findings are clearly erroneous; however, this Court will freely review whether constitutional requirements have been satisfied in light of the facts found." *State v. Farfan-Galvan*, 161 Idaho 610, 613, 389 P.3d 155, 158 (2016) (citation omitted). The majority questions the "speculative terminology" used by the district court in reaching its conclusions. Admittedly, the district court's deliberation process included a fair amount of contemplation along the path to reaching its ultimate conclusion—but as will be shown below, that reflective thought process reveals what we expect of good judges. The court's findings and conclusions are supported by this record and should be affirmed.

The prologue to the ultimate issue here, and the point of dispute between my views and those of the majority is what constitutes a "finding of fact". Black's Law Dictionary defines

20

"findings of fact and conclusions of law" as follows: "After a . . . hearing on a motion, a judge's statement of the facts found to be true and the conclusions of law based on those facts." BLACK'S LAW DICTIONARY (11th ed. 2019). This Court has given a finding of fact a more expansive definition: " '[a] finding of fact is a determination of a fact supported by the evidence in the record.' [Whereas a] statement that 'merely recite[s] portions of the record which could be used in support of a finding' is not a finding of fact." *Searle v. Searle*, 162 Idaho 839, 846, 405 P.3d 1180, 1187 (2017) (quoting *Crown Point Dev., Inc. v. City of Sun Valley*, 144 Idaho 72, 77, 156 P.3d 573, 578 (2007)) (internal citations omitted). *Crown Point* was a case where the Court explained that simple recitation of the testimonies and evidence given did not constitute factual findings. Instead, "they [were] only recitations of evidence which could be used to support a finding without an affirmative statement that the agency is finding the fact testified to." 144 Idaho at 77–78, 156 P.3d at 578–79.

The district court did not simply recite testimony by others; it made factual findings (as quoted below) based on its direct observation on the placement of the "screen," and its makeup and potential for prejudice in the courtroom. The court then made a legal conclusion as to the "screen's" lack of prejudicial effect on Farrell-Quigle. The court's factual findings are supported by substantial evidence and the legal analysis applied by the court is correct. As a result, the court's factual determinations regarding the necessity for alternative testimony, as well as the placement and nature of the screen, are entitled to deference by this Court, even if we might disagree with them.

In addition, the majority's characterization of the district court's decision-making process misstates the detailed and lengthy reasoning progression undertaken by Senior Judge Luster. The majority says that "[o]nly when a scheduling conflict made the use of CCTV inconvenient did the district court *acquiesce* to the State's plan to use a screen," and that "[t]he district court *acquiesced* to the screen primarily because of a failure in planning on the part of the State." (Emphasis added). I believe the record shows otherwise. The majority's statements make it seem as though Judge Luster capitulated to what has now been found an unconstitutional procedure just because scheduling conflicts and the State's lack of preparation forced him to make the wrong decision.

While I am loath to include lengthy block quotes in any legal writing to which I ascribe my name, I am compelled to do so here to counter the undercurrent for this Court's decision that the able trial judge somehow acquiesced in allowing Farrell-Quigle's due process rights to be trampled

21

due to a scheduling problem. To provide a full picture, I will quote extensively from the trial judge's views of the matter, first from his comments during the oral argument on the State's motion for child witnesses testimony by alternative methods and then during the trial. First, from the pretrial hearing:

> I think we probably can all agree this is an extremely serious allegation, and so it is one that I think *the [c]ourt needs to proceed very cautiously in regard to both the defendant's rights* as well as the concern for the emotional health of the witnesses, and, of course, the relative rights of the party, which I've just indicated.
> . . . .
> [I]n theory [an alternate method] sounds fine if we can figure out a way to safeguard the interest of the witnesses and also the rights of the defendant, but *we need to figure out how to do that without creating an atmosphere that would be unduly prejudicial to the defendant, because if we could do that, obviously it isn't going to do any good to have to retry this case because we haven't done it safely and properly.*
>
> I would certainly be concerned if we had a jury walk in and had some kind of a setup that made it look like the child – the innocent, truthful child is being protected from the evil, guilty defendant, . . . that is a concern and I think [defense counsel] was attempting to address it.
>
> . . . . *I still think we need a method that would make the [c]ourt comfortable that the due process concerns that the defendant is entitled to can be properly safeguarded.*
>
> And I'm not sure what exactly the plan is. I mean, right now we're talking in theory as to some things we can do, but if we have the jury on one side of the courtroom and a screen right down the middle of the witness here and [defense counsel] is trying to run around, I don't know how we're doing that.
>
> I don't know if we can explore the closed-circuit testimony method in some fashion, but certainly the [c]ourt is open to any number of possibilities in that regard. . . . [B]ut then *we need to get [a] process in place that would be acceptable to . . . the [c]ourt – to make sure that we have a fair trial for the defendant and one that adequately protects the rights of the children witnesses involved.*
> . . . .
> *I'm sharing [defense counsel's] concern.* If there's something electronically that we can set up and it's just a matter of maybe footing the bill for it, maybe the district court can help in those arrangements, but I don't know what that is and *I think we need to see it so that then we can be comfortable that we can accomplish the goals that we need to accomplish here.*
> . . . .
> *I'm very cognizant of the fact that we have to tread cautiously,* . . .

(Emphasis added). Thus, from the outset the judge noted the need to move forward "cautiously" in order to establish a process that would "make sure that we have a fair trial for the defendant . . ." and that "the due process concerns" of the defendant "can be properly safeguarded."

About two weeks later, during the trial, the judge had a chance to observe the screen (which he didn't even think should be called a screen) in place in the courtroom. The judge then made these findings supporting his choice to implement the alternative method of witness testimony used below:

> *[T]he [c]ourt has articulated, both on and off the record, its concern for due-process considerations in terms of the defendant not being subjected to an environment where there could be some suggestion that would bear on his guilt or innocence absent the consideration of the legally admissible evidence. . . .*
>
> In *Maryland versus Craig*, the Court had basically authorized a closed-circuit communication where the child testified and the jury was able to receive the testimony through closed-circuit TV. That particular process *could be available to the [c]ourt*. The [c]ourt looked into that and discovered that this afternoon the federal court could make their closed-circuit communication devices available for us to use and implement, take advantage of.
>
> Yesterday afternoon, I was able to finally take a look at the State's proposed setup over in the . . . [other] courtroom here . . . . So basically, the conclusion that the [c]ourt had reached, while I recognize that *Maryland versus Craig* addressed the use of a closed-circuit television that provide the protections that have been delineated under both our statute and the case holding by the United States Supreme Court, alternative methods certainly can be explored and used by the [c]ourt provided the proper safeguards would be in place.
>
> I had an opportunity to examine the setup that the State had proposed over at the [other courtroom]. And *frankly, it appears to me that the setup probably would provide more safeguards under the law than the closed-circuit television and [sic] for a number of reasons*. First of all, my main concern – well, I had three concerns here. My first concern is the emotional trauma that the children might suffer. And frankly, I don't think it makes any difference, and there's no presumption here that these children are being honest. That's not the [c]ourt's concern. The [c]ourt is concerned with their emotional health. These children could be – their testimony ultimately could be a result of a hallucination. It could be a result of a manipulation by another individual. It could be a result of a manipulation by themselves or it could be a true rendition of what took place. I make no call on that or no assumption on that, but what I do recognize is [sic] the allegations that are in front of the [c]ourt. Allegations of child sexual abuse at the hands of their father are very substantial allegations. And regardless of the veracity of those allegations, these children will be in a difficult emotional position being asked to come into a courtroom and testify.

And now that, of course, has been exacerbated by the emotional conditions that's been reflected in the professional testimony that I've already alluded to, but regardless, the child's safety is one concern that the [c]ourt has.

The second concern that the [c]ourt has is the defendant's right to confront his accuser. And I think that that would be adequately satisfied in terms of the setup that the State has proposed . . . .

Essentially what we have, and I know counsel's looked at it, but in the courtroom there, it is set up in such a fashion that there – *I don't even want to call it a screen necessarily. It looks to the [c]ourt more like simply some courtroom equipment, basically, an aluminum tripod that has a large board that might be used to demonstrate an exhibit in front of the jury, and it seems basically to be shoved out of the way to one corner up against the wall.* And it's positioned in such a way that the individual who's seated to the far – the [c]ourt's far left at counsel table would be shielded from direct view from the witness stand.

Defense counsel – I think assuming that's where Mr. Quigle would sit, then defense counsel would have a view of the child to be able to question the child. And frankly, the [c]ourt would extend leeway if [defense counsel] felt that he'd be more comfortable standing up, stretching his legs and getting a little better view of the child when he questioned the child, that's not a problem.

But essentially, it is set up in such a way that it would shield the child's view. *More importantly, from the [c]ourt's concern for Mr. Quigle's rights, and that is, is that the [c]ourt does not feel that the setup, as it was demonstrated to the [c]ourt as we will propose to be using it, would indicate in any way some kind of a screen that would send a message to the jury that somehow we're screening the poor, truthful child away from the guilty defendant.*

I don't think that the atmosphere is projected by what's been objected [as] proposed by the State. And so that third concern of the [c]ourt would appear to be satisfied. *Of importance, certainly, from the due-prospect [sic] standpoint, and what I think is probably [an] even better legal alternative method than using the closed-circuit TV, is that the child or children will actually be physically present in front of the jury. They will actually be physically present for the purposes of counsel to question and to cross-examine them.*

And so the importance of the witness being able to communicate to the finder of fact has certainly been preserved. The only limitation that seems to be imposed by this setup is the fact that Mr. Quigle will not be in a position to directly have face-to-face contact with the two child witnesses as they testify. And I recognize he's certainly entitled under the Constitution to confront his accusers; however, under *Maryland versus Craig*, the Supreme Court[] made it clear that that face-to-face confrontation is not absolute provided the [c]ourt makes sufficient

24

findings with respect to the special circumstances that I've outlined in this case both under the Uniform Child Witness Testimony Act in the [S]tate of Idaho as well as the holding in *Maryland versus Craig*. So that is the option the [c]ourt will be utilizing here.

. . . .

The screen that is set up in the courtroom downtown is relatively a miniscule interference. I agree with [defense counsel] that the astute juror might note that things are set up in such a fashion that may screen off the defendant's view of – these children testifying against him.

Whether or not that realization would create some kind of overwhelming unfair imposition of prejudice in the case, I think, is rather doubtful. There's a lot of speculation that we could banter about in terms of what that may or may not mean.

Again, I get back to the fact that the nature of this case is a child's sexual molestation allegation by young girls against their own father. And regardless of whether the defense says that these children are lying or emotionally disturbed or manipulated by their stepmother or whatever else might be at play, a common-sense juror is going to recognize that that is an awkward situation to be in the courtroom with their father, in the same courtroom testifying against their father. *And so I don't think the mere fact that the defendant is shielded from direct view should raise any particular conclusion on the part of the jurors.*

And so I'm not satisfied that – and, in fact, it might be construed to the contrary, that perhaps it just makes sense for everybody involved, even from the defendant's standpoint, that he's – he's falsely accused but still concerned about his children's well-being, and that this would be an appropriate way to proceed. And we can get a lot of conclusions that somebody could draw.

My main concern earlier was that the structure of this setup was going to be in such a way that it would be obvious to a jury that this situation was shielding the child from the defendant and leading to some kind of inference of guilt. *And I don't think what is proposed at all displayed it.*

In fact, frankly, I think from the State's perspective they may be better off proceeding in the other fashion because we still have these two young girls that have to come into the courtroom. They're only just a matter of feet away from their father when they testify. They're going to be very aware that he's sitting there in the courtroom and some of the emotional concerns that we've already talked about may still be at play.

. . . .

*If they're not being truthful, I think the finder of fact can sense that in live testimony, direct testimony, probably a lot easier than they could through an audio-visual technique. So I don't like it. I don't like to have to deal with an alternative, but I think the law provides for it, and this seems to be a situation what would allow*

25

*for it. And I think the process that is in place [is] as good as I think we can hope to accomplish [ ] under the circumstances.*

(Emphasis added).

With the district court's rationale plainly stated before us, I would conclude that the able trial judge did much more than just "acquiesce" to the courtroom setup because of convenience or the State's lack of preparation. The court not only stated its awareness of the need to protect Farrell-Quigle's due process rights, but noted "importantly, from the [c]ourt's concern for Mr. Quigle's rights, . . . that the setup, . . . would [not] indicate in any way some kind of a screen that would send a message to the jury that somehow we're screening the poor, truthful child away from the guilty defendant." The court also noted the "importance, certainly, from a due pro[cess] standpoint" that the chosen method was an *even better alternative than using closed-circuit TV* because the children would actually be present before the jury for both direct and cross-examination. The judge found that the screen was a "miniscule interference," and stated that "[i]f the [girls are] not being truthful, I think the finder of fact can sense that in live testimony, direct testimony, probably a lot easier than they could through an audio-visual technique." Finally, the judge did not like having to take any precautions at all: "So I don't like it. I don't like to have to deal with an alternative, but . . . I think the process that is in place [is] as good as I think we can hope to accomplish [ ] under the circumstances."

As a former trial judge myself, I appreciate the efforts made here by the trial judge who is in a better position to weigh in the balance the serious, competing interests between the compelling state interest (the children's mental health) and the defendant's right to due process, and that the court's *factual* findings warrant deference by this Court. Admittedly, we as an appellate court can look at pictures of the courtroom to give ourselves a view of what the "screen" looked like and how the courtroom was setup. We can then make our own conclusions from the quiet solemnity of our chambers regarding what "any attentive juror" might think of the arrangement. That said, those judges who are in the heat of battle, who with reason and lucidity give articulate conclusions to the weighty questions presented before them, are entitled to due regard by this Court in reaching our conclusions.

I thus respectfully dissent from the majority's conclusion that the placement of a screen blocking a child victim's view of a defendant while they testify in a courtroom is always "inherently prejudicial." Can such a screen be prejudicial? Certainly. The district court here

26

recognized that if the screen were placed out in the middle of the room, positioned between child witness and the defendant, it could improperly prejudice a reasonable jury against the defendant. But the majority today has created a bright-line rule that discounts the specific facts of this case. "Inherent prejudice is found where the practice in question may have a direct impact on the jury's perception of the defendant." *State v. Baeza*, 161 Idaho 38, 41, 383 P.3d 1208, 1211 (2016) (citing *Holbrook v. Flynn*, 475 U.S. 560 (1986)). The trial judge found that "direct impact" lacking; I would do likewise.

In *Baeza*, this Court recognized that "child-friendly" practices, which center on comforting the child, rather than protecting the child from the defendant, are not inherently prejudicial. *Id.* at 42, 383 P.3d at 1212. In holding that CCTV is not inherently prejudicial, the Court recognized many reasons why a six-year-old may testify using closed-circuit video. *Id*. Likewise, in *Flynn*, the United States Supreme Court eventually determined the presence of four uniformed state troopers in the courtroom was not inherently prejudicial based on the "wider range of inferences that a juror might reasonably draw from the officers' presence." 475 U.S. at 569. Thus, an important factor in determining whether a particular practice is inherently prejudicial is whether the practice gives rise mainly to prejudicial inferences or whether the jury could make a wider range of inferences from the use of the procedure. *Id*.

I believe there are many innocuous inferences that arise from the presence of a screen in the courtroom, several of which were identified by the Michigan Court of Appeals in *People v. Rose,* 808 N.W.2d 301 (Mich. App. 2010). In *Rose*, the defendant was facing several allegations of sexual abuse. *Id*. at 306. At trial, the court allowed one of the minor victims to testify from behind a screen that prevented her from seeing the defendant. *Id*. at 308. Much like Farrell-Quigle, the defendant contended the use of the witness screen was inherently prejudicial. *Id*. The Michigan Court of Appeals disagreed, holding that a screen is generally not the type of device that brands a defendant with the mark of guilt, such as wearing prison garb or being shackled and gagged. *Id*. at 316 (citing *Coy v. Iowa*, 487 U.S. 1012, 1034–35 (1998) (Blackmun, J., dissenting)). In discussing the wide array of inferences that a screen could give jurors, the Michigan Court of Appeals recognized that although a juror might conclude the witness feared the defendant because the defendant actually harmed the witness, a reasonable juror could also conclude the witness feared to look upon the defendant because the witness was not testifying truthfully. *Id*. In addition, a reasonable juror could conclude that the screen was being used to calm the witness's general

27

anxiety about testifying rather than out of fear of the defendant in particular. *Id*. The court also acknowledged that anytime a child victim testifies against a defendant who is accused of harming them, the jury is reasonably going to infer that the child has some fear of the defendant. *Id*. Ultimately, the Michigan Court of Appeals rejected the notion that the use of a screen—no matter what its size or composition and no matter how it was employed at trial—must in every case be presumed to prejudice the defendant. *Id*. at 317. The court then found there was no evidence in the record to show that the screen caused actual prejudice because there was no evidence about its size, shape, color, or material used. *Id*.

The facts are even more compelling here than in *Rose*, because of the inconspicuous nature of the screen. The jurors were told that, because of a scheduling conflict, the rest of the trial would be held in a neighboring courtroom. In that new courtroom, a screen, which the district court described as "some courtroom equipment, basically, an aluminum tripod that has a large board that might be used to demonstrate an exhibit in front of the jury," was placed to the side of the courtroom. The minors testified with no alterations to the new courtroom's setup, although the screen was turned parallel to the wall after the minors finished testifying.

Even though a footnote in *Baeza* cautioned against rearranging the courtroom or the witness chair so the child would not have to look in the defendant's direction, that warning likely had in mind the clear prejudice when a screen is positioned in an obvious way in the middle of the courtroom. I understand and agree with the warning in the footnote that advises against such a practice, but I do not read that footnote to be the foundation of a bright-line rule that would invalidate circumstances like those before the Court.

The key due process question is whether the use of a screen is an inherently prejudicial practice and whether the screen justified "an essential state interest specific to each trial." *Baeza*, 161 Idaho at 41, 383 P.3d at 1211 (citing *Flynn*, 475 U.S. at 568–69). Here, it was not immediately apparent that the screen's placement was intended to block the victims' view of the defendant. Unlike *State v. Parker*, where a large, opaque screen, described as the type of panel commonly used as an office partition, was placed against the wall and then deliberately moved several feet into the courtroom for the minor's testimony, and then moved back against the wall after the minor was done testifying, 757 N.W.2d 7, 18 (Neb. 2008), *opinion modified on denial of reh'g*, 767 N.W.2d 68 (2009), the screen that blocked Farrell-Quigle's view was near the wall and was not overtly moved as part of the minors' testimony. The screen was also described as courtroom

equipment, rather than a well-defined panel that was put in place to block the view between a witness and the defendant. Thus, along with the several inferences that a jury might make as cited in *Rose*, it would have been reasonable for the jury here to infer that the easel was simply leftover equipment from a previous trial.

The majority concedes that the jurors could have made a wide array of inferences about the screen, including that it was a "child friendly prop" meant generally to make testifying more comfortable for the children. According to the United States Supreme Court in *Flynn*, whether the jury could make a wider range of inferences from the use of the procedure is an important factor in assessing whether a particular practice is inherently prejudicial. 475 U.S. at 569. Still, the majority claims *Baeza* expresses a need to be more critical of any circumstances that might single-out a defendant for disparate treatment during a jury trial. Thus, the majority concludes that even if jurors viewed the screen as a comfort measure, it was still an exploit that pointed at the defendant alone as the source of the child's discomfort and fear. By focusing exclusively on whether the practice singles out a defendant, the majority inexplicitly ignores the importance of the wide array of inferences referenced above. Such a view turns cases like *Flynn* on their head. *See* 475 U.S. at 572. As the Court noted regarding the scope of our review,

> our task here is not to determine whether it might have been feasible for the State to have employed less conspicuous security measures in the courtroom. While, in our supervisory capacity, we might express a preference that officers providing courtroom security in federal courts not be easily identifiable by jurors as guards, *we are much more constrained when reviewing a constitutional challenge to a state-court proceeding*. All a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw *was so inherently prejudicial* as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show *actual prejudice*, the inquiry is over.

*Id*. (emphasis added).

Indeed, our inquiry should be a similar one – and it should be "over" based upon the district court's deliberative process in weighing the competing factors and making its conclusion that the screen did not unduly point to Farrell-Quigle's guilt. I believe the majority errs by myopically focusing its analysis in this way. A trial court must not be limited solely by a bright-line rule that favors the interests of a defendant at all costs; it must also weigh in the balance *the essential state interest specific to each trial* before reaching such a conclusion. *See Baeza*, 161 Idaho at 41, 383 P.3d at 1211 (even if a court practice is found to be inherently prejudicial, the court must still

29

consider whether it is "justified by an essential state interest specific to each trial."). The essential state interest here, protecting the minor victims' mental health, weighed in the balance and made the use of the "screen" appropriate *in this case*. This requirement belies the majority's attempt to establish a "bright-line rule" in these cases. And as explained above, although the screen was strategically placed between the child witnesses and the defendant to prevent them from seeing one another, the screen's innocuous placement here did not directly point to Farrell-Quigle any more than the fact that he was seated at a table marked "defendant."

Ultimately, I believe the majority's bright-line rule now requires trial courts to use CCTV or video conferencing even when an alternative safeguard such as a screen may be more appropriate based on the facts of the case. In addition, despite the relative ease with which courts are becoming accustomed to using Zoom or other technological advances in managing the court's business, some courtrooms in Idaho are not equipped for CCTV or videoconferencing, including the courthouse in this very case. Contrary to the majority's claims that CCTV or video conferencing is the only appropriate safeguard, a reasonable juror could just as easily infer that the child witness was questioned in a separate room through FaceTime or Zoom because the defendant was a dangerous person warranting his separation from the children. The rationale is the same. I believe the trial court appropriately weighed the risks before concluding that the screen provided a better option so that the children could be physically present in front of the jury.

**B. The screen used here did not violate the Confrontation Clause.**

The second argument Farrell-Quigle makes is that the use of the screen violated his right to confront his accusers in this case. Even though the majority doesn't reach this question it is necessary for me to speak to it, given my position.

I would dispense with this argument simply by citing the United States Supreme Court's holding in *Maryland v. Craig*, 497 U.S. 836 (1990), where Maryland's alternative testimony statute, much like Idaho's, allowed the trial court to make adjustments to protect child victims from the drawbacks in testifying in open court in from of a jury of adults. Since the United States Supreme Court found that the Maryland court's use of a CCTV process did not violate the Confrontation Clause, I would likewise hold that the screen method used here did not violate Farrell-Quigle's 6th Amendment right to confront his accusers. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."

30

*Id*. at 845. Reliability of testimony is ensured by "personal examination," along with providing testimony under oath, subject to cross-examination, where the jury can observe the witness' demeanor. *See id.* at 845-46.

These purposes were well-served here, as recognized by the district court. The steps taken to protect Farrell-Quigle's child victims provided more direct confrontation than the CCTV process advocated by Farrell-Quigle and adopted by the majority would. Although face-to-face confrontation forms "the core of the values furthered by the Confrontation Clause," the United States Supreme Court has "nevertheless recognized that it is not the *sine qua non* of the confrontation right." *Id*. at 847 (citation omitted). In sum, the Court's precedents establish that "the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial," which "must occasionally give way to considerations of public policy and the necessities of the case." *Id*. at 849 (emphasis in original) (citation omitted). Those public policy considerations and the necessities of this case fortified the trial court's decision to use the alternate method it employed. The district court found that the alternate method provided a better way to test reliability than would be afforded through a CCTV system. I agree.

## CONCLUSION

While use of a screen as a broad-based approach has potential limitations when used like the Nebraska trial court in *State v. Parker*, 757 N.W.2d 7, 18 (Neb. 2008), such screens may also be constitutionally used when special circumstances require the use of an alternate method that both protects alleged victims and the rights of the defendant. The alternate method here did just that. I would thus affirm the district court's decisions and use of the alternate method in this case.