# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 49945

STATE OF IDAHO,             )

                         )

        Plaintiff-Respondent,    )       **Boise, September 2024 Term**

                         )

v.                            )       **Filed: March 4, 2025**

                         )

DANIELLE MARIE RADUE    )       **Melanie Gagnepain, Clerk**

                         )

        Defendant-Appellant.     )

_____)

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Jason D. Scott and Patrick J. Miller, District Court Judges.

The district court's judgment and the courts' orders are <u>affirmed</u>.

Nevin, Benjamin & McKay LLP, Boise, attorneys for Appellant.
Dennis Benjamin argued.

Raúl R. Labrador, Idaho Attorney General, Boise, attorneys for Respondent.
Kenneth Jorgensen argued.

_____

BEVAN, Chief Justice.

Danielle Radue appeals from the judgment entered on her conditional guilty plea to first-degree murder, challenging several of the district court's pretrial rulings. Radue argues that the district court: (1) deprived her of her constitutional right to present a defense by excluding expert testimony that, due to her mental state, Radue's use of force or violence upon the minor victim was not willful; (2) abused its discretion by ruling that the State could present 404(b) evidence of other acts of force or violence to prove Radue acted willfully; (3) deprived her of her confrontation rights by ruling it would prohibit the defense from cross-examining the State's medical expert about his actions and testimony in an unrelated case; (4) deprived her of her due process and equal protection rights when it denied her request for funds to hire an expert on false confessions and coercive police interrogation techniques; (5) violated her right to the presumption of innocence when it denied her motion to prohibit the use of the word "victim" to describe the deceased child and his family; and (6) violated her right to a jury trial when it declined to grant her more than three peremptory challenges or to continue the trial until the Supreme Court's COVID-related

1

limitations on the number of peremptory challenges expired. For the reasons below, we affirm the district court's orders and judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 11, 2020, Radue called 911 and stated that her nine-week-old son, D.M., was not breathing. Radue claimed that D.M. was in a swing when he started crying and possibly vomiting. When EMS personnel asked Radue if D.M. was choking, Radue responded that she thought so but was not sure because when she picked D.M. up, his breathing became labored and he "started making a gurgling noise." On the way to the hospital, Radue stated that D.M. "had been sick for a couple of days," that it had been ten minutes since she had last checked on him in his swing, and he had been asleep. Radue later stated, however, that she had taken D.M. into his room to change him, he was "screaming his head off," and she put him on the ground "a lot harder" than she intended. Radue stated that D.M. was on his back and the back of his head struck the floor, and it "scared the crap" out of her because the force was not intentional. Afterward, Radue said D.M. was acting weird and breathing funny.

During medical treatment, D.M. showed "very little evidence of life." A CT scan revealed D.M. suffered from a fractured skull and bleeding in his brain. The physician who examined D.M. stated it took a "significant amount of force" to inflict such an injury, given D.M.'s age. In addition, there were two bleeding events "in different stages of healing." When the doctor informed Radue of the injuries to D.M., she reported that the night before, the family dog had jumped on the couch where D.M. was laying, which caused D.M. to "roll over" and "hit the back of his head onto a carpeted floor." Because of the severe injuries and unlikelihood that D.M. would ever recover, he was eventually removed from the mechanical breathing apparatus, after which he died.

A grand jury indicted Radue for the first-degree murder of two-month-old D.M. through an unlawful "perpetration of, or attempt to perpetrate, aggravated battery on a child under twelve (12) years of age." Radue entered a conditional guilty plea without an admission of factual guilt. The guilty plea preserved her right to appeal several rulings and orders by the district court. The district court imposed a life sentence, with 18 years determinate. Radue filed a timely notice of appeal.

## II. ISSUES ON APPEAL

1.     Did the district court abuse its discretion when it excluded Dr. Cirino's testimony?

2

2.      Did the district court abuse its discretion in allowing the State to present evidence of other acts of violence to show Radue acted willfully?

3.      Did the district court abuse its discretion by prohibiting Radue from cross-examining the State's medical expert about testimony in an unrelated case?

4.      Did the district court err in denying Radue's request for funds to hire an expert on false confessions?

5.      Did the district court err in denying Radue's motion to prohibit the State from using the word "victim"?

6.      Did the district court abuse its discretion in denying Radue's request for a continuance?

### III. ANALYSIS

## A.  Introduction

This appeal presents unique challenges for appellate review. Radue raises several issues based on evidentiary rulings made by the district court before trial as motions in limine. While such motions are a valuable tool for attorneys in preparing for trial, *see State v. Young*, 133 Idaho 177, 179, 983 P.2d 831, 834 (1999), such rulings are often fact-dependent, and can be changed by the trial judge during trial based on the nature of the facts presented. "Since a motion in limine is based on an alleged set of facts rather than the actual testimony, the trial court's ruling is not a final order." *Id.* The trial court may reconsider the issue at any time, including when the actual presentation of facts is made. The trial court may, in the exercise of discretion, choose to defer the ruling until the case unfolds and the evidence is offered in context. *State v. Hester*, 114 Idaho 688, 760 P.2d 21 (1988). Indeed "[o]ne difficulty common to all motions in limine is that they occur—by definition—out of the normal trial context, and resolving such a motion requires the trial court to determine what that context will be. Thus, the court must receive offers of proof consisting either of live testimony or counsel's representations that the court finds sufficiently credible and reliable." *People v. Stevenson*, 12 N.E.3d 179, 187 (Ill. App. Ct. 2014) (quoting *People v. Owen*, 701 N.E.2d 1174, 1177 (Ill. App. Ct. 1998)).

Here, no trial ever took place. We have a limited lower court record with general offers of proof that are helpful insofar as they go, but they lack the context that would be brought out in a trial. Radue pleaded guilty *conditionally* under I.C.R. 11(a)(2), reserving the right to appeal these interlocutory orders. Our appellate rules give her that right, *see id*.; *see also* I.A.R. 17(e)(1)(A) ("the judgment or order appealed from which shall be deemed to include, and present on appeal: (A) All interlocutory judgments and orders entered prior to the judgment, order or decree appealed from . . ."). But our ability to review such issues on appeal is limited. Our standard of review here

is typically, though not always, based on analyzing the trial court's exercise of its discretion in making such decisions. *Barton v. Bd. of Regents of Univ. of Idaho*, ___ Idaho ___, ___, 550 P.3d 293, 300 (2024). Such review is couched in terms of the trial court's view of the proceedings, and its ability to make factual determinations that are "'ordinarily influenced by a host of factors impossible to capture fully in the record[.]'" *Gilbert v. Richard Gerald Radnovich*, 171 Idaho 566, 573, 524 P.3d 397, 404 (2023) (quoting *United States v. Tsarnaev*, 595 U.S. 302, 320 (2022)). We note this limitation at the outset because it frames our discussion as we examine further below.

**B.      The district court did not abuse its discretion when it excluded Dr. Cirino's testimony.**

*1.      The district court did not err in finding that Dr. Cirino's testimony was an effort to present an insanity defense in contravention of Idaho Code section 18-207.*

Radue's first argument on appeal is that the district court abused its discretion and deprived Radue of her constitutional right to present a defense by excluding expert testimony that she could not act willfully because of her mental state. Radue filed a notice of intent to present evidence under Idaho Code section 18-207, and later disclosed Dr. Nicole Cirino, M.D., as an expert witness. Dr. Cirino is a licensed physician and member of the American Board of Psychiatry and Neurology. She has been extensively published in peer-reviewed journals regarding a variety of psychological issues, including postpartum depression and women's health. Dr. Cirino evaluated Radue and diagnosed her with post-traumatic stress disorder with dissociative symptoms (depression and derealization) and postpartum depression. Dr. Cirino wrote, "It is my opinion with reasonable medical certainty that Mrs. Radue lacked the mental capacity to form intent to use force or violence against her infant son, [D.M.]."

The State filed a motion in limine to exclude Dr. Cirino's testimony, arguing that Dr. Cirino's opinion did not meet the criteria for admissibility under Idaho Rule of Evidence 702 because it lacked sufficient foundation to show it would be helpful to the jury. The State also argued that Dr. Cirino's ultimate opinion was conclusory. Radue opposed the State's motion. The district court held an evidentiary hearing to evaluate a proffer of Dr. Cirino's testimony and determine whether it would be admitted.

At the evidentiary hearing, Dr. Cirino testified that she made two diagnoses for Radue: (1) postpartum depression and (2) post-traumatic stress disorder with dissociative symptoms. Dr. Cirino explained that to diagnose post-traumatic stress disorder, one needs to experience a traumatic event in which they felt their own life, or the life of a loved one was threatened or in

4

danger. The initial traumatic event for Radue was domestic violence by her husband, D.M.'s father. Dr. Cirino testified that, at the time of the incident, Radue showed symptoms of PTSD, such as hyperarousal, insomnia, anxiety, and dissociation. Dr. Cirino explained that dissociation is a protective mechanism for trauma victims:

> [S]omething can be so traumatic that you would have to kind of dissociate, alter your consciousness, to leave your body and almost look down on yourself. It's actually a protective mechanism for people that experience pretty significant trauma to have an altered consciousness, to leave your body and not suffer so significantly.
>
> When women or children have repeated trauma, they can then dissociate at times and are not related to direct physical threats. And they have problems controlling the dissociation that occurs. So under severe stress like the perinatal period, dissociation is more likely to occur. So things like insomnia, stress, sleep deprivation. In some cases, infant crying or other stressors are going to bring up our stress response. That could lead to dissociative symptoms.

Dr. Cirino additionally diagnosed Radue with post-partum depression:

> Postpartum depression, it's unique in that the symptoms are much more anxiety-related, and about 30% of women have these obsessive compulsive thoughts or obsessive symptoms. They usually have to do with harm to the infant, and this is probably over evolution in purpose to have an increase in these obsessive symptoms.
>
> So often women will describe being very concerned that the baby will choke or stop breathing or that they're going to die, you know, they're going to die of SIDS, or the breast milk is contaminated. So a lot of the things that would -- we would all be concerned about for a young kind of helpless baby can be heightened in postpartum depression. So usually it's a combination of anxiety and depression in the postpartum period.

Based on her testing and clinical interviews, Dr. Cirino concluded that Radue was in a dissociative state at the time of the incident, her cognitive processes were impaired, she could not perceive external events accurately, and she could not process information and act rationally.

Dr. Cirino concluded that Radue "did not intend to do a violent act to [D.M.] because of the psychiatric symptoms that occurred that she was experiencing":

> Q. How do you ultimately conclude what you've stated is your -- was your determination, your opinion in this case?
>
> A. . . . I would say that my report states that the symptoms are present, the symptoms impair cognition as well as other cognitive processes and that -- that they were present at the time of the event. They impaired decision-making ability. And that it was not intentional or willful to commit a violent act -- to not commit a violent act intentionally or willfully.

Q. And you used the term, and [the prosecutor] used this in his example, impaired. When you use that term impaired, do you mean inability?

A. Inability to intend to act willfully, she did not have the capability to act willfully.

After the hearing, the district court found that the proposed opinions from Dr. Cirino were inadmissible. The district court found that Dr. Cirino's testimony provided a clinical explanation for how Radue was feeling the way she was (detached from mind and body), and that Radue's PTSD and postpartum depression resulted in three major psychiatric symptoms that contributed to Radue's lack of mental capacity:

(1) Dissociative symptoms which included depersonalization (the experiences of being detached from her mental process, a "zombie"); derealization (the experience of unreality of her surroundings); and amnesia (loss of memory of events) preceding and during the incident; (2) Severe insomnia: days of severe insomnia led to impairment of consciousness, a disruption of short-term memory and high distractibility; (3) Depression: depressive cognition slowed her thinking process and led to difficulty with decision-making ability, as well as the ability to organize her thoughts and actions.

The district court concluded that "none of these opinions reflect that [Radue] was not able to perform a voluntary act. They may reflect issues related to culpability that can be considered if [Radue] is convicted of an offense, but do not relate to an element of the offense charged." In summary, the court concluded:

Dr. Cirino provides a clinical diagnosis [sic], describes the symptoms of those diagnoses and then ultimately testifies that because of Defendant's mental conditions and the resultant symptoms, the Defendant was highly distracted and did not consciously make a decision to use force or commit a violent act upon D.M. But Dr. Cirino [did] not testify that the Defendant was unable to willfully pick up D.M., take him to the changing table and then put him to the floor. The Defendant would like to be able to equate being highly distracted and detached from mind and body to the inability to willfully use force or violence. Dr. Cirino is not able to say that Defendant did not perform the interdicted acts knowingly. When one distills all of Dr. Cirino's opinions, her opinion is that the Defendant did not intend or appreciate the consequences of her actions and that she did not have the ability conform her conduct to the requirements of the law.

The district court additionally conducted an Idaho Rule of Evidence 403 analysis and determined that, even if Dr. Cirino could articulate an opinion strictly limited to whether Radue had the capacity to act willfully, the chance of jury confusion was extreme given that Idaho does not have an insanity defense. The court found that it ultimately appeared "that Dr. Cirino's opinion was not that [Radue] couldn't form the intent to perform voluntary actions or that she was

6

unconscious, but rather that she knew what was happening, but she just felt distant or detached as if she was an outside observer of her mental process or body."

Considering Idaho Rule of Evidence 702's requirement that expert testimony help the jury understand the evidence, the district court concluded that Dr. Cirino's testimony was more likely to confuse the jury than help it understand the evidence.

"A trial court's decision to admit expert testimony is reviewed for abuse of discretion." *State v. Merwin*, 131 Idaho 642, 645, 962 P.2d 1026, 1029 (1998). This Court will "first freely review and determine whether the proffered evidence is relevant, and secondly we evaluate whether the district court abused its discretion in determining whether the probative value was outweighed by unfair prejudice." *State v. Meister*, 148 Idaho 236, 239, 220 P.3d 1055, 1058 (2009).

Though Idaho abolished the insanity defense, "Section 18-207, Idaho Code, does not prevent a defendant from presenting relevant evidence of [her] mental state." *State v. Diaz*, 170 Idaho 79, 84, 507 P.3d 1109, 1114 (2022) (quoting *State v. Beam*, 109 Idaho 616, 621, 710 P.2d 526, 531 (1985)). Idaho Code section 18-207 provides in relevant part:

> (1) Mental condition shall not be a defense to any charge of criminal conduct.
>
> . . . .
>
> (3) Nothing herein is intended to prevent the admission of expert evidence on the issue of any state of mind which is an element of the offense, subject to the rules of evidence.

I.C. § 18-207.

Thus, Idaho Code section 18-207(3) does not "prevent the admission of expert evidence on the issue of any state of mind which is an element of the offense . . ." but such evidence is "subject to the rules of evidence." *Diaz,* 170 Idaho at 84, 507 P.3d at 1114 (quoting *State v. Fisher*, 162 Idaho 465, 467, 398 P.3d 839, 841 (2017)). Indeed, evidence of a mental condition is expressly permitted to rebut the State's evidence offered to prove criminal intent or mens rea. *Id*. "Whether the accused possessed the necessary intent to commit the offense is a question for the finder of fact." *Id*. at 85, 507 P.3d at 1115 (quoting *State v. Oxford*, 167 Idaho 515, 523, 473 P.3d 784, 792 (2020)). Thus, any expert testimony admitted on the issue of mens rea or state of mind under Idaho Code section 18-207, must speak to an element of the crime. *Id*. (citations omitted).

The indictment charged Radue with first-degree murder through an unlawful "perpetration of, or attempt to perpetrate, aggravated battery on a child under twelve (12) years of age." A battery

is defined as the "[w]illful and unlawful use of force or violence upon the person of another[.]" I.C. § 18-903(a). "The word 'wil[l]fully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage." I.C. § 18-101(1). Thus, the relevant mental state under the charge is whether Radue had "a purpose or willingness to commit the act" of employing "force or violence upon" D.M., regardless of whether she intended to injure him.

Radue argues that Dr. Cirino's opinion that Radue's mental state at the time of the incident prevented her from purposefully using force or violence upon D.M. was relevant because it tended to prove she did not act willfully. Radue contends Dr. Cirino's testimony would have been helpful to the jury in determining whether the State had proved the element of "willfulness" beyond a reasonable doubt. Radue argues that the district court misinterpreted Dr. Cirino's testimony when it construed her statement that Radue "did not intend to perform a violent act. That she did not act willfully[,]" to mean "did not intend or appreciate the consequences of her actions and that she did not have the ability to conform her conduct to the requirements of the law." Radue contends that Dr. Cirino's opinion that Radue did not act willfully was a simple and straightforward answer to the central issue in the case: Dr. Cirino was to testify that Radue could not act willfully, not that Radue did not intend or appreciate the consequences of her actions.

Although Dr. Cirino discussed whether Radue acted "willfully," Dr. Cirino did not apply the legal definition of that word ("a purpose or willingness to commit the act. . . . It does not require any intent to violate law, or to injure another[.]" I.C. § 18-101(1) Instead, Dr. Cirino's focus was on whether Radue was able to, in her words, "consciously form intent to process -- to commit a violent act[.]" In rejecting Dr. Cirino's testimony, the district court properly focused on Dr. Cirino's analysis and the conclusions she intended to offer. The district court's decision to exclude the testimony was proper and is supported by the law and the record.

Our Court of Appeals has examined two cases involving the intent required for aggravated battery: *State v. Billings*, 137 Idaho 827, 54 P.3d 470 (Ct. App. 2002), and *State v. Pole*, 139 Idaho 370, 79 P.3d 729 (Ct. App. 2003). Radue claims both cases support her argument that the State was not required to just prove Radue willfully committed the act, which happened to be forceful or violent; it was required to prove that Radue *intended* the act to be forceful or violent. In *Billings*, a defendant "aimed his shotgun to the right" of the victim and "fired into the ground." 137 Idaho

8

at 828, 54 P.3d at 471. Pellets "ricocheted off the ground" and struck the victim. *Id*. The State charged Billings with aggravated assault and aggravated battery. *Id*. The State argued "the only intent the State was required to prove was that Billings intended to fire the shotgun." *Id*. at 829, 54 P.3d at 472. The Court of Appeals rejected that argument, holding instead that, to prove aggravated battery, the State needed to prove that Billings intended the shotgun pellets to strike the victim. *Id*. at 830, 54 P.3d at 473. Even so, the Court of Appeals found there was sufficient evidence to support the knowledge element because Billings' intent could be inferred. *Id*. at 831, 54 P.3d at 474. The Court of Appeals explained the nature of the shotgun was one that fired scores of pellets, and that Billings knew that if the pellets hit the ground, "when there's gravel and stuff there, they can ricochet." *Id*. As a result, while there was no direct evidence that Billings intended to shoot his victim, there was sufficient evidence that he knew that some pellets would hit the victim, which was enough to meet the willfulness standard under Idaho Code section 18-903(a). *Id*.

A year later, in *State v. Pole*, 139 Idaho 370, 79 P.3d 729 (Ct. App. 2003), the Court of Appeals again considered the requisite mental state for battery under Idaho Code section 18-903(a). Pole fired a .357 caliber pistol into the exterior wall of his apartment. *Id*. at 371, 79 P.3d at 730. Before discharging the weapon, Pole had pointed the gun at two of his roommates and suggested they play Russian roulette. *Id*. When the roommates declined, Pole turned and fired a round through the adjacent wall, hitting someone behind the wall in the adjoining apartment. *Id*. Pole was unaware the apartment was occupied when he fired the gun, but the bullet that went through the wall paralyzed the victim. *Id*. The Idaho Court of Appeals explained that Pole's conduct did not amount to aggravated battery because although the evidence showed Pole willfully pulled the trigger, it did not show that Pole knew the victim was on the other side of the wall. *Id*. at 375, 79 P.3d at 734.

This Court subsequently dealt with the admissibility of expert testimony to establish that a defendant lacked the mens rea to commit aggravated battery in *State v. Diaz*, 170 Idaho 79, 507 P.3d 1109 (2022). There, the defendant sought to introduce expert testimony that he suffered from a mental illness or defect that caused him to believe the victim was not a person, but an alien being from another planet. *Id*. at 84, 507 P.3d at 1114. As in this case, Idaho Code section 18-903(a) required the State to prove the defendant acted willfully. *Id*. The district court determined that the case turned on what state of mind the State must prove the defendant had when he committed the battery: "If the only state of mind required is that the defendant acted willfully, then expert

testimony that [the defendant] lacked capacity to form intent is irrelevant. On the other hand, if the state of mind is something more—that the defendant knowingly performed the willful action—his alleged incapacity to form intent would be relevant." *Id*.

In *Diaz*, the State argued that, because knowledge is not an element of aggravated battery under section 18-903(a), it did not need to prove the defendant subjectively knew his victim was a human. Thus, the expert testimony that the defendant thought his victim was an alien was irrelevant. *Id*. at 85, 507 P.3d at 1115. The district court acknowledged the distinction between "willful" and "knowing" was an important one, and we agreed, concluding, "the State must show Diaz knew his victim was a person when he chose to use force or violence, not merely that he used force or violence upon something that turned out to be a person." *Id*. at 85, 507 P.3d at 1115. We held although the plain language of the statute did not explicitly require the State show the defendant had knowledge that his actions would willfully injure another human, that knowledge was implied from the statute and must be proven to sustain a conviction for the same. *Id*.

We also held our decision aligned with *Pole* and *Billings*:

> Pole intended to shoot the wall, not another person, and the evidence did not show Pole knew the anyone was on the other side when he shot the wall. Billings intended to shoot another person, because he knew that if he shot the ground, the pellets would ricochet and hit his victim. The rationale underpinning both cases bolster our decision here that the pertinent fact is whether the defendant intends to use force or violence against another person. Here, we cannot conclude that expert testimony on whether Diaz intended to injure another person is irrelevant.

*Id*. at 86–87, 507 P.3d at 1116–17.

The district court here concluded that *Diaz* was distinguishable because Radue did not dispute that she put her child on the floor after taking him from the diaper changing table and that, as a result of D.M.'s contact with the floor, the child's skull was fractured, causing hemorrhaging and ultimately death. We agree with the district court's logic. Unlike *Diaz* (where the defendant argued he did not have the ability to form the intent to use force or violence upon the person of another as he thought the victim was an alien), Radue argued Dr. Cirino's expert testimony would show she did not have the mental capacity to act willfully. Following this Court's guidance in *Diaz*, the district court determined "willfully" means simply a purpose or willingness to commit the act.

Dr. Cirino opined that Radue was in a dissociative state at the time of the incident, her cognitive processes were impaired, she could not perceive external events accurately, and she

10

lacked the ability to process that information and act rationally. She testified that, in her opinion, Radue was experiencing "[d]epersonalization" or "derealization" which she described as "the alteration of consciousness where you feel like your mind and body are disconnected and you're kind of looking down on yourself." This makes it "difficult to process information rationally and to act accordingly."

Yet, as outlined by the district court, Dr. Cirino's ultimate opinion was that Radue did not intend or appreciate the *consequences* of her actions. The district court concluded that Dr. Cirino was not testifying that "[Radue] couldn't form the intent to perform voluntary actions or that she was unconscious, but rather that she knew what was happening, but she just felt distant or detached as if she was an outside observer of her mental process or body." This is not a case in which Radue mistakenly grabbed D.M. instead of a doll or had some involuntary action where she inadvertently dropped D.M. to the floor. Radue concedes as much in her reply brief, stating "Radue never denied knowingly putting the baby down. She told the detective so. And there was no claim of mistakenly placing him on the ground when, for example, she thought she was putting him in a cradle. Nor did she claim that she accidentally dropped the baby on the ground." Radue has not disputed that she purposefully or willfully set D.M. on the floor. Thus, we hold that the district court acted properly when it excluded Dr. Cirino's testimony. The district court correctly concluded that Dr. Cirino's testimony was an effort to support an unavailable insanity defense and did not ultimately go to Radue's capacity to act willfully as defined by law. As a result, the district court did not err.

2. *We decline to address Radue's I.R.E. 403 and 702 challenges.*

Radue additionally argues that the district court abused its discretion in excluding Dr. Cirino's testimony because it misapplied the legal standards in Idaho Rule of Evidence 403 and 702."). Because we have concluded that the district court applied the proper legal analysis to exclude Dr. Cirino's testimony under Idaho Code section 18-207, there is no need to address the district court's rulings under Rules 403 or 702.

3. *The district court's ruling did not deprive Radue of a valid defense.*

Last, Radue claims the district court's exclusion of Dr. Cirino's testimony violated her right to present a defense. "The right to present a defense is protected by the Sixth Amendment of the United States Constitution and made applicable to the states through the due process clause of the Fourteenth Amendment." *State v. Meister*, 148 Idaho 236, 239, 220 P.3d 1055, 1058 (2009) (citing *Washington v. Texas*, 388 U.S. 14, 19 (1967)). "This right is a fundamental element of due process

11

of law." *Id.* The right to present a defense includes the right to offer testimony of witnesses, compel their attendance, and to present the defendant's version of the facts "to the jury so it may decide where the truth lies." *Id.* Even so, there is no constitutional right to present irrelevant evidence. *See State v. Sepulveda*, 161 Idaho 79, 86, 383 P.3d 1249, 1256 (2016) ("If evidence is not relevant, the defendant has no constitutional right to present it.") (brackets omitted). "A defendant has no right to present irrelevant evidence; even if evidence is relevant, it may be excluded in certain cases." *State v. Ogden*, 171 Idaho 258, 272, 519 P.3d 1198, 1212 (2022) (internal citations omitted).

Radue argues that the district court overlooked the constitutional dimension of depriving her of the evidence she needed to put forth the defense that she did not act willfully. Radue contends that the district court could have taken steps short of exclusion to eliminate any prejudice to the State. Radue further claims the district court failed to act consistently with the legal standards applicable to the specific choices available to it by failing to weigh Radue's constitutional rights against any prejudice to the State. We disagree.

The exclusion of Dr. Cirino's expert testimony did not violate Radue's right to present her defense. As we previously determined, Dr. Cirino's testimony was not relevant because it did not address the mens rea of the crime—that Radue purposefully or willfully used force or violence against D.M. Because the testimony was not relevant, we hold that the exclusion of that testimony did not violate Radue's right to present a defense.

## C. The district court did not abuse its discretion in allowing the State to present evidence of prior acts of violence or force to show Radue acted willfully.

Next, Radue argues that the district court abused its discretion when it ruled the State could present Rule 404(b) evidence to show Radue acted willfully. Again, we note the constricted nature of our review because the district court's evidentiary rulings were not part of a complete trial record. But based on the record before us, we conclude the district court did not abuse its discretion in its 404(b) rulings.

The State sought to introduce evidence that Radue was often frustrated with D.M., and that frustration manifested itself as rough or possibly violent actions such as forcefully putting him in his car seat and forcefully putting him in the corner of outdoor furniture. The State argued the evidence was relevant to "motive, intent, knowledge, identity, absence of mistake or lack of accident." The district court allowed the testimony, reasoning that "[e]vidence of how the

Defendant handled her baby on a daily basis would be relevant to her assertion that she did not have the capacity on the day of the incident to form the intent to use force or violence" and "has probative value other than showing propensity" because it "directly relates to the credibility of Defendant's position that she didn't . . . intend to put baby D.M. down as hard as she did."

It is well established that evidence of other crimes, wrongs, or acts is not admissible to prove criminal propensity; that is, evidence of other crimes, wrongs, or acts cannot be introduced as evidence that a defendant who committed a prior bad act is more likely to have committed the currently charged bad act. *State v. Grist*, 147 Idaho 49, 52, 205 P.3d 1185, 1188 (2009). Such evidence may, however, be introduced if probative of another relevant matter such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. I.R.E. Rule 404(b)(2). Idaho courts follow a two-tier process to evaluate the admissibility of evidence offered under Rule 404(b)(2):

> First, the trial court must determine whether there is sufficient evidence to establish the other crime or wrong as fact. The trial court must also determine whether the fact of another crime or wrong, if established, would be relevant. Evidence of uncharged misconduct must be relevant to a material and disputed issue concerning the crime charged, other than propensity. Such evidence is only relevant if the jury can reasonably conclude that the act occurred and that the defendant was the actor.

> Second, the trial court must engage in a balancing under I.R.E. 403 and determine whether the danger of unfair prejudice substantially outweighs the probative value of the evidence. This balancing is committed to the discretion of the trial judge. The trial court must determine each of these considerations of admissibility on a case-by-case basis.

*Grist*, 147 Idaho at 52, 205 P.3d at 1188 (citations and quotations omitted).

The Idaho Court of Appeals has observed that "the admissibility of evidence of other crimes, wrongs, or acts to establish intent and an absence of mistake or accident is well established, particularly in child abuse cases." *State v. Hassett*, 124 Idaho 357, 362, 859 P.2d 955, 960 (Ct. App. 1993) (quoting *United States v. Harris*, 661 F.2d 138, 142 (10th Cir. 1981)).

> [W]hen the crime is one of infanticide or child abuse, evidence of repeated incidents is especially relevant because it may be the only evidence to prove the crime. A child of [very young age] . . . is a helpless, defenseless unit of human life. Such a child is too young, if he survives, to relate the facts concerning the attempt on his life, and too young, if he does not survive, to have exerted enough resistance that the marks of his cause of death will survive him. Absent the fortuitous presence of an eyewitness, infanticide or child abuse . . . would largely go unpunished.

13

*Id.*

The proper question when such evidence has been determined relevant is "(1) whether the other acts are relevant to a material and disputed issue concerning the crime charged, other than propensity; and (2) whether the probative value is substantially outweighed by the danger of unfair prejudice." *State v. Ortega*, 157 Idaho 782, 787, 339 P.3d 1186, 1191 (Ct. App. 2014) (citing *Grist*, 147 Idaho at 52, 205 P.3d at 1188). For example, evidence of prior abusive parenting can show an "injury caused by [defendant's] action or inaction was likely intentional and unlikely to be accidental." *State v. Ortega*, 157 Idaho 782, 788, 339 P.3d 1186, 1192 (Ct. App. 2014).

When reviewing a ruling under Idaho Rule of Evidence 404(b), this Court "exercises free review over the first inquiry—relevance—but reviews the second inquiry—risk of unfair prejudice—under an abuse of discretion standard." *State v. Sheldon*, 145 Idaho 225, 229, 178 P.3d 28, 32 (2008). When reviewing a trial court's decision for an abuse of discretion, this Court must analyze "[w]hether the trial court[:] (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choice available to it; and (4) reached its decision by the exercise of reason." *State v. Ochoa*, 169 Idaho 903, 912, 505 P.3d 689, 698 (2022) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)).

Radue argues that the evidence proffered by the State only showed that Radue had a propensity to handle D.M. roughly, thus, it is not admissible under *Grist*. And even if the 404(b) evidence had some tendency to show Radue acted willfully in this case when placing the baby on the floor, Radue argues the danger of unfair prejudice substantially outweighed the evidence's probative value. For the reasons detailed below, the evidence would have been relevant at trial because Radue denied willfulness in causing the injury to D.M. and asserted the injury was caused by mistake or accident.

1. *Evidence that Radue "was rough" with D.M. and on one occasion placed him in the car seat "roughly."*

The State's offer of proof described statements Gayle Brennan (Radue's paternal aunt) made during an interview with detectives:

> Adam [D.M.'s father] described a conversation he had this date with Gayle who basically and essentially blamed Adam for everything that happened to [D.M.]. Gayle said she previously informed Adam about Dani putting [D.M.] in his car seat "rough, and being rough with him." Gayle said it was basically the fault of Adam's parents, Dani's parents, and Adam for not giving Dani the help she needed. . . .

14

A report from Detective Jeff Fuller, discussing Gayle's statements, stated, in relevant part:

> Gayle indicated that she (Dani) comes in, drops [D.M.] off, and when she comes to get [D.M.], she puts [D.M.] in his car seat, "not the way I would put a child in a car seat". I asked Gayle what she meant, Gayle said, "she's, she's rough". I asked if she (Dani) would just throw [D.M.] in the car seat, and Gayle replied, "yeah, without moving the, you know the thing you hold to move them". Cpl. Lindley asked Gayle if [D.M.] would ever accidentally kinda hit the handle, which Gayle said she would just kind of not being careful with him or anything and just tossed him in there.

The district court found this testimony "relevant to a material and disputed issue concerning the crime charged—whether [Radue] acted willfully at the time of the incident." The court noted that there did not appear to be any dispute that Radue's actions caused the injuries that resulted in D.M.'s death. Thus, whether Radue willfully used force or violence was a key, if not *the* key, issue. The court determined that evidence of how Radue handled D.M. every day would be relevant to her assertion that she did not have the capacity on the day of the incident to form the intent to use force or violence. The court held the evidence had probative value other than showing propensity for using force or violence; it directly related to the credibility of Radue's position that she did not purposefully or willfully use force or violence against D.M. when she put him down as hard as she did. On these facts, the district court did not find that the probative value was substantially outweighed by the danger of unfair prejudice or that the other perils identified in Rule 403 were at play.

Radue argues the proffer did not contain evidence about how Radue handled D.M. "on a daily basis" and that Gayle's statement that Radue was "too rough" is an inadmissible opinion because there is no explanation about what made Radue's actions "rough." Radue argues the more accurate characterization of Gayle's statements was that she saw a single incident of carelessness where Radue placed D.M. in the seat "without moving the . . . thing you hold to move them." What "Gayle said [was Radue] would just kind of not be[ ] careful with him or anything and just tossed him in there." Radue argues that carelessness is not the purposeful use of force or violence. Radue also notes that there is not any indication when this incident occurred, thus, it could have occurred weeks before the day that D.M. died. Accordingly, Radue argues this evidence does not have a tendency to prove that she willfully used force or violence against D.M. when she set D.M. down too hard. Radue also claims that Gayle's testimony that she put D.M. down roughly in the car seat, on a single occasion, at a different time and under different circumstances, when there was no

15

claim that Radue was dissociating, has no probative value because it does not tend to prove what Radue's actions were at the time of D.M.'s injuries.

The proffer showed that Gayle would testify that she was a regular caregiver for D.M. and that "on at least one occasions [sic], when [Radue] came to get D.M., she put him in the car seat roughly" and "indicated that [Radue] would just toss D.M. into the car seat and not be careful with him." Gayle stated to officers that when Radue put D.M. in his car seat she was "rough," and Gayle confirmed that Radue would "throw [D.M.] in the car seat," and that she was "not being careful with him or anything and just tossed him in there." Thus, contrary to Radue's claims, Gayle's statements were that Radue was rough.

Gayle's testimony that Radue was inconsiderate with D.M. does not conflict with her statement that she witnessed Radue being rough with D.M. Both observations can be true. Further, both descriptions are relevant to Radue's claim that she did not purposefully or willfully put D.M. down as hard as she did. Radue's defense was that she did not have the capacity on the day of the incident to form the intent to use force or violence. Evidence of prior abusive parenting shows an "injury caused by [defendant's] action or inaction was likely intentional and unlikely to be accidental." *Ortega*, 157 Idaho at 788, 339 P.3d at 1192. Here, because Radue denied willfulness in causing the injury and asserted the injury was caused by mistake or accident, the proffered evidence was relevant. This evidence went to the central issue of whether Radue willfully used force or violence rather than not knowing what she was doing or making a mistake.

The difficulty for Radue here arises under the second inquiry—risk of unfair prejudice. Since this evidence has some "tendency to make [her willfulness] more or less probable than it would be without the evidence," I.R.E. 401(a), we are left with analyzing the district court's exercise of discretion sitting with a "front row seat" to view and weigh the potential prejudicial effect of this evidence. On the record before us we cannot say the district court acted outside the outer bounds of that discretion. *See State v. Ochoa*, 169 Idaho 903, 912, 505 P.3d 689, 698 (2022). As a result, we hold that the district court did not abuse its discretion in finding that the probative value was not substantially outweighed by the danger of unfair prejudice.

2.     *Evidence that on the day of the incident Radue shoved or put D.M. in the corner of the outside patio furniture "with some force."*

16

The State also sought to introduce evidence that Radue put D.M. in the corner of an outdoor wicker chair "with some force." Detective Joseph Miller's supplemental report was submitted as the source of the following information:

> Det. Miller and the Defendant then went back through the events of that morning and discussed what had occurred in more detail. The Defendant indicated that she had been frustrated with D.M. when she was feeding him outside that morning and that she had put him in the corner of the wicker chair a little bit harder that [sic] she should have. She estimated using a force of "3 or 4" out of ten (10). She stated that "I knew I was frustrated, so I placed him there. . . . That's where my frustration started today when he just wouldn't take the rest of the bottle." The Defendant indicated that [D.M.] was "whining" and would not take any more of his bottle so she put him into the corner of the chair outside. She added that "she did not throw him or anything" but that she "just kind of shoved him into the corner." When officers suggested that this was harder than she should have, the Defendant agreed. The Defendant indicated that the reason she left him in the chair was because she could feel herself getting frustrated. She further explain[ed] that "usually that's enough for me, but, I don't know why, it just, it happened really fast." When asked, the Defendant indicated that on a scale of one (1) to ten (10), with one (1) being how she normally set him there as a happy baby and ten (10) where she is throwing the Victim in the corner, it was a three (3) or four (4). She later explained that most of the day she was "pretty fine" and that she can get frustrated but "not to the point of, you know, acting in a way that I can't control."

The district court determined this evidence was probative of whether Radue willfully used force or violence at the time of the subject incident, and the probative value was not outweighed by the danger of unfair prejudice. At the time the district court made its ruling, whether Radue suffered dissociative symptoms or impairment of consciousness at the time of D.M.'s fatal injury was the central issue. Thus, the court concluded that Radue's conduct toward D.M., particularly on the day of the incident, was highly probative of this question.

Radue argues the court erred in ruling to admit this evidence because putting D.M. down with the force of a three or four out of ten is not probative of whether she willfully used force or violence against D.M. at the time of the incident. Radue submits there is no evidence that she purposefully used any extra force in putting D.M. down or that she willfully put him down hard. Radue speculates that "[p]lacing D.M. down gently would have taken at least a one or two on the officer's scale of ten. Putting him down normally would have been a three or four. Thus, Ms. Radue's comments can be understood to mean that she failed to place D.M. down very gently and thus it was too hard." The trial court did not abuse its discretion when ruling that Radue's statement would have been admissible based on the proffered record before it. Nor are we in a position, based

17

on that theoretical record, to say whether this evidence, tested against the crucible of evidence at trial, could possibly be viewed in a different light; that record is not before us. Based on the pretrial ruling made, we are left with Radue's statement that she "had been frustrated with D.M." and that she had put him in the corner of the wicker chair "a little bit harder that [sic] she should have."

Radue's claim that this evidence is not relevant to prove her mental state, the absence of mistake, or lack of accident is based on her trying to minimize or ignore parts of the State's offer of proof. For the same reasons identified above, Radue's treatment of D.M., and her use of force to set D.M. down somewhere, is relevant to whether she had the requisite intent at the time D.M. suffered from his fatal injury.

After concluding that the evidence was relevant, the district court engaged in a Rule 403 balancing test:

> The evidence is probative of whether Defendant willfully used force or violence at the time of the subject incident. The probative value is not outweighed by the danger of unfair prejudice. . . . [W]hether Defendant suffered dissociative symptoms or impairment of consciousness at the time of the incident is the central issue. Defendant's conduct toward D.M., particularly on the day of the incident, is highly probative of this issue.

Under Rule 403, a court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." I.R.E. 403. The district court here concluded that Radue's behavior on the day of the incident was "highly probative" of her mental state and that the probative value was not "outweighed by the danger of unfair prejudice." Although the district court did not use the word "substantially," when we examine the totality of the court's analysis, we conclude that the district court conducted a proper Rule 403 analysis.

As a result, we conclude that the district court did not abuse its discretion.

**D. Radue's argument that the district court abused its discretion by prohibiting Radue from cross-examining the State's medical expert about testimony in a prior case is not preserved for appeal.**

We ultimately hold that Radue has failed to preserve her argument that the trial court erred in prohibiting Radue from cross-examining the State's medical expert about the expert's testimony in a prior case. That said, the background of how this issue arose in the district court is relevant to that conclusion, and so we discuss it first.

18

Radue argues that the district court deprived her of her Sixth Amendment right to confront witnesses when it prohibited her from cross-examining the State's medical expert about a prior case. Below, the State retained Dr. Matthew Cox as a medical expert. While performing background research in another case, Radue's counsel discovered a case in which Dr. Cox's testimony had been criticized by the Texas Court of Criminal Appeals in *Walker v. Texas*, No. PD-1429-14, 2016 WL 6092523 (Tex. Crim. App. Oct. 19, 2016) (holding that the difficulty with Dr. Cox's opinion was that he formed his opinion without knowing crucial facts about how injuries were caused to a child). Radue moved to exclude Dr. Cox's testimony, arguing the State had an obligation to disclose the *Walker* case and its failure to do so constituted a *Brady*[1] violation. The State maintains there was no *Brady* violation and filed its own motion in limine to prohibit Radue from eliciting any evidence or statements from the *Walker* decision pursuant to Idaho Rules of Evidence 401, 402, and 403. The district court found there was no *Brady* violation and granted the State's motion to prohibit Radue from cross-examining Dr. Cox about the *Walker* case, holding the decision was minimally relevant to Dr. Cox's credentials or credibility, and that minimal probative value was substantially outweighed by the danger of confusing the issues, misleading the jury, and wasting time. Significantly for our review here, the district court's ruling was based on whether Dr. Cox was competent to testify; nothing about Radue's argument below raised the question of bias that Radue now raises on appeal.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" *Pointer v. Texas*, 380 U.S. 400, 400–01 (1965). This constitutional right, incorporated in the Fourteenth Amendment and therefore applicable in state proceedings, includes the right to conduct reasonable cross-examination. *Olden v. Kentucky*, 488 U.S. 227, 231 (1988) (citations omitted). A defendant's right of confrontation will be violated by a restriction on cross-examination which precludes inquiry into a matter clearly relevant to the credibility of a prosecution witness. *Id*. at 231–32. Thus, "[w]hile the scope of cross-examination is largely within the discretion of the trial court, wide latitude should be allowed." *State ex rel. Rich v. Bair*, 83 Idaho 475, 479, 365 P.2d 216, 218 (1961) (refusal to permit relevant cross-examination was reversible error).

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

19

Idaho Rule of Evidence 611(b) provides that "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility." At the same time, "[e]vidence that goes to the credibility of a complaining witness is normally admitted under a broad standard." *State v. Joy*, 155 Idaho 1, 13, 304 P.3d 276, 288 (2013). This Court has consistently held that where a defendant is seeking to show bias or test the credibility of the complaining witness on cross-examination, the trial court should allow considerable latitude. *State v. White*, 97 Idaho 708, 713, 551 P.2d 1344, 1349 (1976); *State v. Storms*, 84 Idaho 372, 376, 372 P.2d 748, 750 (1962); *State v. Spencer*, 74 Idaho 173, 180, 258 P.2d 1147, 1151 (1953).

This Court reviews the rulings of the trial court regarding cross-examination of a witness under the abuse of discretion standard. *Clark v. Klein*, 137 Idaho 154, 156, 45 P.3d 810, 812 (2002). *See Ochoa*, 169 Idaho at 912, 505 P.3d at 698. The implication of the constitutional protections of the Confrontation Clause is a question of law over which the Court exercises free review. *State v. Hooper*, 145 Idaho 139, 142, 176 P.3d 911, 914 (2007).

The district court determined that the *Walker* decision was not an indictment of Dr. Cox's credentials or veracity; rather, the Texas decision was a cautionary tale about the use of experts and the fact that potential juries will put undue weight on their testimony. The district court concluded that nothing in *Walker* suggested Dr. Cox lied or misrepresented any fact; instead, he was called to offer an opinion based on limited facts, and the blame for his testimony should fall on the prosecution and judge who admitted the testimony in the Texas case.

Radue disagrees and argues that the *Walker* decision shows that Dr. Cox's opinions are subject to confirmation bias: that he is biased toward finding intentional abuse and will form opinions to confirm that bias even when evidence needed to support the conclusion is lacking or unknown, and that he will ignore evidence that contradicts his preferred conclusion. In support, Radue contends that Dr. Cox jumped to a conclusion of intentional abuse in *Walker* based on: (1) an assumption about the water temperature (which turned out to be incorrect) without considering relevant factors (the physical ability of the Walkers to hold their granddaughter above the tub and dip her into the hot water); (2) the child's likely reaction to being dipped into hot water (pulling legs up out of the water and thrashing), and (3) by ignoring evidence supporting an accidental burning (the absence of grasp marks and the presence of the two long scratches). Radue argues that the district court misanalysed the issue by focusing on the Texas court's conclusions about the foundation for Dr. Cox's testimony rather than examining Dr. Cox's bias toward making a finding

20

of intentional abuse. Radue emphasizes that Dr. Cox was willing to take the limited facts before him and testify to an opinion that was unsupported by the totality of the evidence.

Before we can consider the merits of Radue's argument, we must first address the State's contention on appeal that Radue's claim of confirmation bias is not preserved. The State claims that Radue argued below that the *Walker* decision showed Dr. Cox "did not base his opinion [on] the facts of the case and had engaged in all types of assumptions" which went to his "competency." But according to the State, the claim that Radue now advances on appeal, pertaining to Dr. Cox's alleged bias, is a different claim than the allegation made below.

In general, this Court will not hold that a district court erred in deciding an issue or a party's position on an issue that it did not have the opportunity to address. *State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019). "A party may refine issues that they have raised below with additional legal arguments so long as the substantive issue and the party's position on that issue remain the same." *Siercke v. Siercke*, 167 Idaho 709, 715–16, 476 P.3d 376, 382–83 (2020) (citing *Ada Cnty. Highway Dist. v. Brooke View, Inc.*, 162 Idaho 138, 142 n.2, 395 P.3d 357, 361 n.2 (2017)). "A distinction exists between a refined issue, appropriate for review, and a new issue, unfit for consideration." *Id*. at 716, 476 P.3d at 383 (citation omitted). This Court will decide refined legal arguments on an issue heard and decided by the court below, but in fairness to the district court and the opposing party, we cannot usurp the district court's role by deciding new legal issues in the first instance. *Id*. In other words, "[a] groomed horse is expected on appeal, but a different horse is forbidden." *Id*.

Radue did not make any specific argument that Dr. Cox was biased below; however, she cited authority that supported her right to inquire into potential bias or the motive of a witness on cross-examination. *See State v. Araiza*, 124 Idaho 82, 856 P.2d 872 (1993) (discussing the Sixth Amendment's guarantee that in all criminal proceedings the accused has the right to be confronted with the witnesses against the accused); and *State v. Green*, 136 Idaho 553, 38 P.3d 132 (Ct. App. 2001) (discussing the right of confrontation, which includes the right to attack the credibility of adverse witnesses, including the opportunity to show bias in favor of the prosecution).

While we note Radue's citation to relevant authority below, that citation alone is insufficient to preserve her argument on appeal on a basis that was not argued to the district court. A party waives an issue if either argument or authority is lacking. *Bach v. Bagley*, 148 Idaho 784, 790, 229 P.3d 1146, 1152 (2010). Radue did not make any argument alleging that Dr. Cox was

21

*biased* to the district court. The district court focused exclusively on Radue's claim that the *Walker* decision was relevant to impeach Dr. Cox's *competency*. This Court can consider refined legal arguments on an issue heard and decided by the court below, but we will not usurp the district court's role by deciding new legal issues in the first instance. *Siercke*, 167 Idaho at 716, 476 P.3d at 383 (citing *State v. Gonzalez*, 165 Idaho 95, 98–99, 439 P.3d 1267, 1270–71 (2019)). Radue's argument that the *Walker* decision was necessary to show Dr. Cox's opinions are likely to suffer from confirmation bias was not presented to the district court for a decision below. Accordingly, it is not preserved for appeal.

**E. The district court did not err in denying Radue's request for funds to hire an expert on false confessions.**

Radue additionally claims that the district court denied her rights to due process and equal protection by denying her motion for funds to retain Keith Findley as an expert witness on police interrogation techniques. Below, Radue filed a motion asking an independent district judge (the "money judge") to authorize the use of public funds to obtain the services of Findley as an expert knowledgeable in "[i]nterrogations that result in coerced and/or false confessions" due to the use of certain interrogation techniques. Radue's motion was brought before the money judge who denied Radue's motion for public funds after listening to the audio recording of Radue's statements and finding that there was no reason to conclude that Radue had "inculpated herself falsely" or been coerced by police. The money judge recognized that D.M.'s fatal injuries were almost certainly caused by someone, D.M. was in Radue's care, and there was no suggestion that someone else was around who might be blamed. In concluding that providing public funding for an expert in false confessions was not warranted, the money judge noted that its order would not foreclose Radue from pursuing a false-confession strategy at trial—she could testify (or present other evidence) that she didn't actually do to [D.M.] what she told police she did to him. The order merely denied public funding for an expert in false confessions.

The money judge further found that Radue's strategy of engaging an expert to challenge her statements about how D.M.'s injuries were inflicted seemed to contradict her defense that her actions inflicting those injuries were not willful. As for Radue's other theory of the case, the money judge approved funds for Radue to retain Dr. Cirino to testify about Radue's state of mind and whether she lacked the mental capacity to form the intent to use force or violence.

Radue later moved to suppress the statements she made to the police, arguing that her statements were made involuntarily. In support, Radue highlighted the interrogation tactics that Detective Miller used, minimizing the offense and Radue's moral culpability:

Dani agreed [D.M.] was her first child and I spoke of the pressures of being a parent. I explained no one wakes up, planning on loosing [sic] their temper with their child. I described it as a "slow burn," and in "an instant" things can happen. I explained things usually present include a "triggering mechanism," such as vomiting, which I said we have in this case, and Dani agreed. I said it is usually something "real quick," followed by an assessment by the caregiver, who then seeks help most times, which I said we have in this case. I explained this was not a question of if she loves [D.M.], and when I asked, Dani confirmed she loves [D.M.]. I spoke further on how injuries can happen even when someone loves someone. I explained and demonstrated how under certain circumstances an event can happen so quickly. (I demonstrated a brief grabbing / shaking in anger or frustration.)

. . .

I again told Dani this was an "inflicted injury." I said there is likely a "shaking event" with some type of an "impact on a flat surface" such as a wall, the floor, or the palm of her hand. I told Dani she was the last to be with [D.M.], and she agreed saying, "Yeah." I explained this was not a question of if she loves [D.M.] or not, rather, a question of Dani explaining herself to us, so we can document, and add her side of things, as to what led to this, and what stresses caused this to happen. I explained the truth comes from being able to match the x-rays and imaging to what the parent or caregiver tells us. I continued with theme development of stress, a good parent who "lost their cool," opposed to someone being a "nasty" person.

Radue argues that because she did not have an expert to testify that these interrogation techniques were coercive, the district court denied her motion to suppress:

Detective Miller's questioning did become pointed and he used tactics to elicit statements from Ms. Radue. Such tactics included developing themes of how injuries can happen even when someone loves someone and under certain circumstances an event can happen so quickly. None of the tactics were threatening. To the [c]ourt's observation, the questions asked and the method of questioning did not overcome Ms. Radue's free will.

"Indigent defendants are entitled as a matter of due process and equal protection to the basic tools of an adequate defense, including the provision of expert assistance at public expense when such is necessary for a fair trial." *State v. Oxford*, 167 Idaho 515, 521, 473 P.3d 784, 790 (2020) (quoting *State v. Brackett*, 160 Idaho 619, 633, 377 P.3d 1082, 1096 (Ct. App. 2016)); *see also* I.C. § 19-852(1)(b) ("An indigent person who is . . . under formal charge of having committed, or is being detained under a conviction of, a serious crime, is entitled . . . . [t]o be provided with

23

the necessary services and facilities of representation including investigation and other preparation.").

Under Idaho Criminal Rule 12.2(a), "[a] defendant may submit a motion requesting public funds to pay for investigative, expert, or other services that he believes are necessary for his defense." Assistance is not automatically authorized, "but rather depends upon [the] needs of the defendant as revealed by the facts and circumstances of each case." *Oxford*, 167 Idaho at 521, 473 P.3d at 790 (quoting *Brackett*, 160 Idaho at 634, 377 P.3d at 1097).

> It is thus incumbent upon the trial court to inquire into the needs of the defendant and the circumstances of the case, and then make a determination of whether an adequate defense will be available to the defendant without the requested expert or investigative aid. If the answer is in the negative, then the services are necessary and must be provided by the state . . . .

*Id*. at 521–22, 473 P.3d at 790–91 (quoting *State v. Wood*, 132 Idaho 88, 100, 967 P.2d 702, 714 (1998)). These are ultimate matters of discretion, and we find no abuse of that discretion by the trial court here. *Id.* at 520, 473 P.3d at 789.

On appeal, Radue argues that she needed her expert to establish that her statements to police were coerced for purposes of her motion to suppress. Radue cites several portions of Findley's law review article that recognizes that, in shaken baby/abuse head trauma cases, the police often assume that the caretaker has "lost his or her temper or run out of patience with a crying child and, in a fit of frustration, shaken the child so violently that the ensuing internal brain injuries were fatal." Brian L. Cutler, Keith A. Findley & Timothy E. Moore, *Interrogations and False Confessions: A Psychological Perspective*, 18 CANADIAN CRIMINAL LAW REVIEW, at 390. Radue contends that without Findley's assistance, the district court was without the information necessary to make a sensible determination on her motion to suppress. From Radue's perspective, she did not need to show that the statements made to the police were false to obtain funding because Findley could have testified that the statements were involuntary, and the court abused its discretion by not recognizing this possibility. Radue also claims that the money judge's comment that she could still pursue a false-confession strategy at trial was incorrect because the district court later ruled Dr. Cirino could not testify about Radue's mental state.

As a threshold issue, the State claims Radue's argument that she needed funding for an expert so that she could pursue a motion to suppress is not preserved. The State contends that Radue suggested below that the expert was "necessary for adequate preparation for the upcoming

24

jury trial and for Ms. Radue's defense[,] "[the] testimony is necessary to provide full context to the jury and to uphold Ms. Radue's right to bring a vigorous defense[,]" and the testimony would "help the trier of fact to understand evidence and/or determine a fact in issue regarding the statements made by Danielle Marie Radue in the course of the investigation of this case by law enforcement and/or obtained by law enforcement in the course of the investigation of the case." Because Radue requested the expert for trial preparation, the State claims that Radue cannot change horses to now claim the money judge abused its discretion by not appointing the false-confession expert for a task unmentioned in her request (citing *State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019) (Court will not address matter district court was not given opportunity to rule on and "both the issue and the party's position on the issue must be raised before the trial court for it to be properly preserved for appeal")).

Radue adequately brought up whether an expert was needed to determine if her statements to the police were coerced or involuntary below. That is precisely the issue now on appeal. Whether Radue requested funds to retain Findley in furtherance of a motion to suppress or to be presented at trial does not alter the fact that Radue's request for funds was made in support of her defense. Radue's argument is preserved for appeal.

Turning to the merits, we conclude that Radue has not shown the money judge abused its discretion in denying her motion for funds. To find that a defendant's statement was involuntarily given, the defendant's will must have been overcome by the police conduct at the time of the confession. *State v. Wilson*, 126 Idaho 926, 929, 894 P.2d 159, 162 (Ct. App. 1995) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973)). Confronting a suspect with evidence is not coercive in a constitutional sense. *State v. Rounsville*, 136 Idaho 869, 874–75, 42 P.3d 100, 105–06 (Ct. App. 2002). The money judge's finding that, given the circumstances surrounding the confession, Radue was not coerced into providing erroneous statements is a reasonable exercise of discretion, given that D.M.'s fatal injuries were almost certainly caused by someone, D.M. was in Radue's care, and there was no suggestion that someone else was around who might be blamed. Further, the fact that the district court later ruled that the testimony of Dr. Cirino was inadmissible does not retroactively render the money judge's denial of funds for Dr. Findley an abuse of discretion. As a result, the district court did not err in denying Radue's request for funds to hire an expert on false confessions.

**F. The district court did not err in denying Radue's motion in limine to prohibit use of the word "victim" at trial.**

Next, Radue argues that the district court erred in allowing the State to refer to D.M. and/or D.M.'s family as a "victim." Below, Radue filed a motion in limine to prohibit the use of the word victim at trial, arguing it would undermine her presumption of innocence:

> [S]ince the Defendant has the right to the presumption of innocence as provided to him [sic] by the Constitution, by referring to the complaining witness as a "victim," it removes that presumption by implying that the defendant has committed a crime. Such an implication is unfairly prejudicial to Ms. Radue and the jury would likely believe that she would have had to have committed a crime for there to be a "victim" or "alleged victim."

The district court denied Radue's motion. The court found that in common usage the term "victim" refers to a person who suffers from a destructive or injurious action or agency, and whether D.M. suffered from a destructive or injurious action was not disputed. Rather, the question was whether Radue could form the requisite intent to be responsible for D.M.'s death. The court found that the word "victim" did not inherently imply that the person charged with causing the destructive or injurious action is guilty of the offense, noting that "[t]hrough the course of a trial, the jury is reminded several times that the defendant is presumed innocent, that the jury cannot infer any responsibility based upon the fact that charges have been brought, and that the court's use of the term does not indicate any opinion as to whether a person is a victim or that the defendant committed the offense." The court concluded that it was inherently speculative that a juror would even know of certain statutory definitions of the word "victim" and any such risk would be negated by the jury instructions. Finding no basis for potential prejudice, the district court denied Radue's motion.

"The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment." *State v. Farrell-Quigle*, 167 Idaho 773, 778, 477 P.3d 208, 213 (2020) (quoting *Estelle v. Williams*, 425 U.S. 501, 503 (1976)). "Although the presumption of innocence is not among the rights of the accused enumerated in the text of the U.S. Constitution, it is a core component of a fair trial in the criminal justice system." *Id*. "When an appellant asserts the violation of a constitutional right, we give deference to the trial court's factual findings unless those findings are clearly erroneous." *State v. Dunlap*, 155 Idaho 345, 361, 313 P.3d 1, 17 (2013) (quoting *State v. Pearce*, 146 Idaho 241, 248, 192 P.3d 1065, 1072 (2008)). "We exercise free review over the trial court's

26

determination as to whether constitutional requirements have been satisfied in light of the facts found." *Id.*

Neither the United States Supreme Court nor this Court have directly addressed whether use of the word "victim" violates due process. Even so, this Court has approved a standard jury instruction that directs jurors that they are to draw no inferences from the use of the term at trial:

> I may at times use the word "victim" in these instructions or in the course of this trial. This word is used only to refer to a person or persons who are alleged to have been victimized, and is used only for convenience. It does not indicate any opinion on my part that a person is a victim, or that the defendant has committed an offense. Whether a person is a victim, and whether the defendant is guilty of any offense, are matters for you alone to determine based on the evidence presented at trial.

ICJI 105.

Radue argues this instruction does not preserve a defendant's right to the presumption of innocence, and the use of the word "victim" presupposes the defendant has committed the offense. Radue maintains that if the court referred to D.M. or members of his family as a victim, it is telling the jury that a crime has been committed, and in the context of this case, Radue is the only person who could have committed that crime.

Radue cites several jurisdictions that have disfavored use of the term "victim." *See People v. Williams*, 17 Cal. 142, 147 (1860) (the word victim, in the connection in which it appears, is an unguarded expression, calculated, though doubtless unintentionally, to create prejudice against the accused); *State v. Mundon*, 292 P.3d 205, 230 (Haw. 2012) (". . . unless there are good reasons found by the court for permitting otherwise, the court should instruct all counsel that they and their witnesses must refrain from using the term."); *State v. Devey*, 138 P.3d 90, 95–96 (Utah. App. 2006) (in cases such as this—where a defendant claims that the charged crime did not actually occur, and the allegations against that defendant are based almost exclusively on the complaining witness's testimony—the trial court, the State, and all witnesses should be prohibited from referring to the complaining witness as "the victim."); *Jackson v. State*, 600 A.2d 21, 24 (Del.1991) ("We agree with defendant that the word 'victim' should not be used in a case where the commission of a crime is in dispute."); *Veteto v. State*, 8 S.W.3d 805, 816–17 (Tex. App. 2000), abrogated on other grounds, *State v. Crook*, 248 S.W.3d 172 (Tex. Crim. App. 2008) ("Referring to [the child] as the victim instead of the alleged victim lends credence to her testimony that the assaults occurred and that she was, indeed, a victim."); *State v. Sperou*, 442 P.3d 581, 590 (Or. 2019) ("[T]he use of the term "victim" to refer to the complaining witness or other witnesses, in

circumstances where the accusers' own testimony is the only evidence that the alleged criminal conduct occurred, conveys the speaker's belief that the accusers are credible); *State v. Albino*, 24 A.3d 602, 617 (Conn. App. 2011) ("When there is no doubt that a homicide occurred and that the defendant was the person who caused it to occur, and the only question for the jury is whether the homicide was justified, the prosecutor's repeated reference to the 'victim,' . . . amounts to an opinion on the ultimate issue of the case."); and *State v. Wigg*, 889 A.2d 233, 236 (Vt. 2005) ("[W]here the commission of a crime is in dispute and the core issue is one of the complainant's credibility, it is error for a trial court to permit a police detective to refer to the complainant as the 'victim.' ").

Recognizing this line of authority, the cases that Radue relies on do not universally condemn using the term "victim" at trial. Indeed, many only criticize use of the term when there are questions about the commission of the act. For example, in *State v. Devey*, 138 P.3d 90, 95 (Utah Ct. App. 2006), the Utah Court of Appeals held that use of the term "victim" rather than "alleged victim" was improper in a child sexual abuse case "where a defendant claims that the charged crime did not actually occur, and the allegations against that defendant are based almost exclusively on the complaining witness's testimony." Likewise, in *State v. Austin*, 422 P.3d 18, 31 (Haw. 2018), the Hawai'i Supreme Court found that use of the term "victim" is not error when the defendant did not "dispute that [the victim] was murdered" but asserted the defense that "he was not the individual who had caused her death." Here, as found by the district court, there is no dispute that D.M. suffered death from an injurious action of Radue; rather, the question was whether Radue had the capacity to form the requisite intent to commit that action.

The State argues the more appropriate approach is to allow the district court discretion to address using the term "victim" based on the facts of the case. The State cites several jurisdictions that have determined use of the word "victim" is a discretionary matter for the trial court. *See State v. Bolivar*, 477 P.3d 672, 677 (Ariz. Ct. App. 2020) (trial courts should have flexibility in determining how to refer to crime victims during criminal proceedings); *Groves v. State*, 360 So. 3d 1012, 1017–18 (Miss. Ct. App. 2023); *People v. Horton*, 119 N.Y.S.3d 296, 303–04 (N.Y. App. Div. 2020); *see also United States v. Granbois*, 119 F. App'x 35, 38 (9th Cir. 2004) (use of the word "victim" in the elements instruction did not undermine presumption of innocence); *United States v. Gibson*, 690 F.2d 697, 703 (9th Cir. 1982) ("prosecutor's use of the word 'victim' was fair comment on the evidence"); *State v. Rodriguez*, 946 A.2d 294, 307 (Conn. App. Ct. 2008)

(prosecutor's use of the term victim did not rise to the level of prosecutorial misconduct). *State v. Washington*, 214 N.E.3d 1188, 1222 (Ohio Ct. App. 2023) (although "alleged victim" is preferable, "use of the term 'victim' is not necessarily the same as expressing an opinion that a defendant is guilty of a crime.").

The existence of ICJI 105 demonstrates that this Court has already considered and approved of use of the term victim in some cases. "The pattern jury instructions are presumed to be an accurate statement of Idaho law." *State v. Doe (2021-38)*, 172 Idaho 292, 532 P.3d 396, 401 (2023) (citing *State v. Bodenbach*, 165 Idaho 577, 586, 448 P.3d 1005, 1014 (2019)). And jurors are presumed to follow such instructions. *State v. Hall*, 163 Idaho 744, 807, 419 P.3d 1042, 1105 (2018) (citing *State v. Carson*, 151 Idaho 713, 718, 264 P.3d 54, 59 (2011)). Therefore, we hold that indiscriminate use of the word "victim," instead of a neutral term like "alleged victim," while not favored, does not automatically violate a defendant's due process rights, and the district court did not err in denying Radue's motion in limine to prohibit its use.

## G. Radue's challenge to the district court's decision limiting her peremptory challenges is moot following this Court's decision in *State v. Harrell*.

Last, Radue argues the district court erred in limiting her number of peremptory challenges. Ordinarily, in cases in which a defendant is facing a potential life sentence, both the defense and the state are entitled to ten peremptory challenges. I.C. § 19-2016. However, on February 17, 2022, this Court issued an order that limited the number of peremptory challenges to three because of the COVID-19 pandemic. Radue objected to the reduced number of peremptory challenges, arguing she had a constitutional right to ten. Alternatively, Radue moved to continue trial until the Court's order expired, noting that a challenge to the reduction of peremptory challenges was pending in *State v. Harrell*, 173 Idaho 45, 538 P.3d 818 (2023). The decision in *Harrell* has since been issued, with the Court holding that the Idaho Constitution does not guarantee a criminal defendant a specific number of peremptory challenges. *Id*. at ___, 538 P.3d at 826. The Court additionally held that a defendant's federal due process rights are not violated by limiting the defendant to three peremptory challenges instead of ten pursuant to the emergency order adopted in response to the COVID-19 pandemic. *Id*. at ___, 538 P.3d at 826–27. Given this Court's decision in *Harrell*, and absent argument from Radue to overrule *Harrell*, Radue's claim is now moot.

## IV. CONCLUSION

For the reasons above, the district courts' orders and Radue's judgment of conviction are affirmed.

JUSTICES BRODY, MOELLER, ZAHN, and MEYER CONCUR.